IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GREAT AMERICAN INSURANCE COMPANY, | ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | Civil Action No. 05-857 |
| vs. | ) ) | |
| HONEYWELL INTERNATIONAL INC., | ) ) | |
| Defendant/Counterclaimant. | ) | |

**MEMORANDUM OPINION**

CONTI, District Judge

In this memorandum opinion, the court considers the motion for summary judgment
(Doc. No. 40) filed by defendant/counterclaimant Honeywell International Inc. ("defendant" or
"Honeywell") with respect to all claims against Honeywell asserted by plaintiff/counterclaim
defendant Great American Insurance Company ("plaintiff" or "Great American").  Plaintiff, in its
complaint, asserted claims against Honeywell for breach of contract, unjust enrichment, breach
of express warranty, breach of the implied warranty of merchantability and breach of the implied
warranty of fitness for a particular purpose.  After considering the joint statement of facts ("J.S.")
and the other submissions of the parties, and drawing all reasonable inferences in favor of
plaintiff, defendant's motion for summary judgment will be denied with respect to plaintiff's
breach of contract and unjust enrichment claims.  With respect to plaintiff's breach of express
warranty claims,  defendant's motion for summary judgment will be granted.  Defendant's
motion for summary judgment will be granted without prejudice with respect to plaintiff's breach

of implied warranty of merchantability and breach of implied warranty of fitness for particular purpose claims.  Because plaintiff's breach of contract and unjust enrichment claims survive summary judgment, the court will deny defendant's motion for summary judgment with respect to defendant's counterclaim.

***Factual Background***

**The Parties**

The Clay Center for the Performing Arts and Sciences (the "Center") is a multi-use museum and cultural facility.  (J.S. ¶ 1.)  The Center is located in Charleston, West Virginia.  (Id.)  Dick Corporation ("Dick") was hired as the project general contractor for the construction of the Center (the "Project").  (J.S. ¶ 2.)  Dick subcontracted various components of the Project to a number of other companies.  (Id.)  Limbach Companies ("Limbach") was subcontracted to perform the mechanical work.  (Id.)  Rost Enterprises ("Rost") was subcontracted to perform the building management systems work.  (Id.)  Initially, the parties structured an agreement whereby Comfort and Process Solutions ("CPS") was subcontracted by Limbach to perform the control system work.  (Pl.'s Ex. 2.)  The control system was to regulate properly the heating, air conditioning and ventilation of the Center.  (J.S. ¶ 69.)  Honeywell was in the business of providing control systems equipment, literature explaining how to install and use that equipment, programming, software and technical support to its customers.  (J.S. ¶ 35.)  Great American was the surety for Rost and provided certain payment and performance bonds to Limbach for the Project.  (J.S. ¶ 3.)

**Negotiations Between Limbach, CPS and Honeywell**

In the summer of 2000, Limbach had discussions with CPS regarding CPS being awarded the subcontract for the control system work.  (J.S. ¶¶ 4, 6, 7-8.)  Limbach expressed concerns relating to CPS's ability timely and properly to complete the control system work.  (Pl.'s Ex. 2.)  On July 13, 2000, Limbach's estimating manager/contract manager, James Claus ("Claus"), sent CPS a letter detailing Limbach's concerns.  (Id.)  Claus indicated in his July 13, 2000 letter that Limbach's concerns may be alleviated by drawing support, in the form of a guarantee, from Honeywell.  (Id.)  Notwithstanding any concerns, Limbach continued negotiations with CPS.  See infra.

During the course of the negotiations between Limbach and CPS, Honeywell indicated to Limbach that CPS was a qualified installer of Honeywell control systems.  (Pl.'s Ex. 2; J.S. ¶ 37.)  On June 20, 2000, Mike Keller ("Keller"), area market leader for Honeywell, wrote to Limbach regarding CPS's qualifications.  In that letter, Keller stated:

> Comfort and Process Solutions (CPS) is an Authorized Honeywell Excel 5000 Contractor.  This authorizes CPS to sell, engineer, install and service Honeywell's EXCEL 5000 direct digital control systems and related HVAC control components for building automation.  CPS works directly with Honeywell to provide its customers with cost-effective solutions based on Honeywell's high-quality HVAC controls and building automation systems.
>
> Honeywell selected CPS after it met several stringent requirements.  These include its proven reputation within the construction industry, financial resources necessary to undertake large projects, and its technical expertise in all facets of building control applications, such as engineering, project management, commissioning and ongoing maintenance.  Honeywell has chosen CPS, in particular, because of their strong presence and quality reputation in the new construction and retrofit control industry.  CPS has trained its staff at Honeywell's Home and Building Control University and through the company's professional training courses.

> Since being authorized to sell Honeywell's Excel direct digital control systems
> CPS has demonstrated a very high level of technical expertise.  Their staff
> includes ex-Honeywell personnel.  Should CPS ever require support they have full
> access to Honeywell's direct factory technical support.  Honeywell warrantees the
> products to CPS who in turn provides the specified warrantees to the customer.
>
> With CPS, you are being served by one of our foremost Excel 2000 Contractors.

(Pl.'s Ex. 2.)  Keller had no recollection of any projects previously completed by CPS that

rivaled the magnitude of the Project.  (J.S. ¶ 43.)   At the time of the negotiations related to the

control system work, CPS had only been in business for approximately one year.  (J.S. ¶ 42.)

Keller believed that it was in Honeywell's interest that CPS procure a subcontract with Limbach

because Honeywell would ultimately benefit from selling the control system products to CPS.

(J.S. ¶ 40.) Keller's compensation was affected by the amount of Honeywell products sold in his

territory, which encompassed the Center.  (J.S. ¶ 41.)

**The August 2000 Letter Agreement**

Despite Honeywell's representations regarding CPS's qualifications to complete the

controls work on the Project, Limbach sought further assurances from Honeywell.  (J.S. ¶¶ 7-8.)

Specifically, Limbach wanted to enter into a written agreement with Honeywell that ensured that

Honeywell would complete the control systems work if CPS did not.  (Def.'s Ex. A.)  Further,

Limbach required that CPS provide a payment and performance bond to Limbach.  (Id.)  On

August 23, 2000, Limbach sent a letter to Honeywell, which memorialized the agreement among

Limbach, Honeywell and CPS (the "August 2000 letter agreement").  (Id.)  The August 2000

letter agreement provided:

> We have issued a Subcontract to Comfort & Process Solutions of Lexington, KY.
> One of the conditions of this Subcontract is that Comfort and Process Solutions

4

provide a double obligee bond naming both Limbach and Honeywell on the bond. This bond will protect both our firms in the event of default.

By executing this letter, Honeywell hereby agrees to assume the obligations of Comfort & Process Solutions under the Subcontract and to complete the work in a timely manner to meet the project schedule requirements in the event of default by Comfort & Process Solutions on the Subcontract as determined by Limbach.  As an obligee under the bond, Honeywell can then pursue the bonding company for its costs beyond those costs covered by the remaining Subcontract balance between Comfort & Process Solutions and Limbach Company.

Limbach will submit all CPS payment applications to Honeywell for review and approval before payment to CPS.

(Id.)  The August 2000 letter agreement was executed by Keller, on behalf of Honeywell, and Claus, on behalf of Limbach.  (Id.)  Mark Saunier ("Saunier"), president of CPS, was copied on the August 23, 2000 letter agreement.  (Id.; J.S. ¶ 80.)  Keller testified that, in his twenty-three years of employment with Honeywell, this was the first and only time he knew of where Honeywell obtained the right to review and approve an approved installer's payment applications on a job. (J.S. ¶ 63.)  Honeywell obtained the right to review and approve payment applications in part to monitor CPS's work on the Project and the subcontract balance.  (J.S. ¶ 64.)

By letter dated August 24, 2000, Keller forwarded the executed August 2000 letter agreement to Limbach and indicated that Honeywell was providing "firm assurance that Honeywell will assume the obligation of [CPS] in the event of default of [its] subcontract." (Pl.'s Ex. 2.)

**The March 2001 Letter Agreement**

After the August 2000 letter agreement was executed, the parties learned that CPS was unable to obtain a surety bond for the control system work.  (J.S. ¶ 10.)  The parties, therefore,

5

sought to restructure their previous agreement so that CPS would still be subcontracted to perform the control system work.  (J.S. ¶ 11.)  Limbach, Rost and CPS agreed that Limbach would issue the control system subcontract to Rost.  (Id.)  Rost would then subcontract the control system work to CPS.  (J.S. ¶ 11.)  On March 23, 2001, the parties entered into a letter agreement that memorialized the new agreement among the parties (the "March 2001 letter agreement").  (J.S. ¶ 12; Def's. Ex. D.)  The March 2001 letter agreement, which was directed to Keller, provided:

> Referring to the letter dated August 2 [sic] 2000 that was executed by you on behalf of Honeywell (copy enclosed), Comfort & Process Solutions, in conjunction with Rost Enterprises (the electric contractor selected by Comfort & Process Solutions), has requested that we restructure the agreement.  Specifically, they would like us to issue our subcontract to Rost Enterprises for the control system.  Rost Enterprises, in turn, will issue the double obligee bond, required in our agreement, which will name both Limbach and Honeywell as oblige[e]s.
>
> All other terms of our August 23, 2000 agreement will remain in effect.  If Honeywell agrees with this revised amendment, please have the enclosed copy of this letter executed by an authorized representative of Honeywell . . . .

(Def's. Ex. D.)  Saunier from CPS, Bill Rost from Rost and Jack Kumper from Limbach were copied on the March 2001 letter agreement.  (Id.)  Keller executed the March 2001 letter agreement on behalf of Honeywell and Mark Shaffer, vice president of Limbach, executed the agreement on behalf of Limbach.  (Id.)  By letter dated March 27, 2001, Keller again stated that Honeywell was providing "firm assurance that Honeywell will assume the obligation of [CPS] in conjunction with [Rost]."  Limbach, Rost and Honeywell intended that any unpaid amount on CPS's subcontract would be available to compensate Honeywell for its costs if Honeywell had to complete the control system work for CPS.  (J.S. ¶ 72.)

6

Great American issued a subcontract performance bond (the "bond") dated August 10, 2000.  The bond named Rost as the principal and Limbach as the obligee.  (Def.'s Ex. F.)   By way of dual obligee rider, Honeywell was named as an additional obligee.  (Id.)  Great American did not know about the August 2000 and March 2001 letter agreements (collectively referred to as the "Letter Agreements") when it issued the bond. (J.S. ¶ 81.)

**CPS's Performance of the Control System Work**

During the course of the Project, CPS purchased control system products from Honeywell.  (J.S. ¶¶ 15, 35, 55.)  The purchased products cost CPS approximately $150,000. (J.S. ¶ 36.)[1]  Honeywell employee, Steven Amato ("Amato"), building control specialist, performed some of the work for CPS.  The parties dispute the amount of work Amato performed during the time CPS was responsible for completing the control system work.  (J.S. ¶ 56.) According to Saunier, Amato completed approximately 80% to 90% of the programming work related to the control system.  (Deposition of Mark Saunier ("Saunier Dep."), at 56-57.)  Amato indicated that he completed between 40% to 50% of the programming related to the control system.  (Deposition of Steven Amato ("Amato Dep.") at 38-39.)

---

[1]The record is unclear with respect to the total amount of the subcontract between Rost and CPS.  In its briefing, Great American argues that the total subcontract amount was $444,705 not including approximately $150,000, which was earmarked to purchase products from Honeywell.  See Plaintiff's Brief in Opposition to Summary Judgment at 23.  In an email between Keller and Jerry Petricca, Keller indicated that CPS's contract amount was $635,000 and that approximately $150,000 would be used to purchase Honeywell's products.  (Pl.'s Ex. 2 at 25-26.)  There is no reference to the date of this email and the court was not provided a copy of the email.  For purposes of deciding the summary judgment motion the court will view the facts in the light most favorable to the nonmoving party, Great American, and will assume that the amount of CPS's subcontract was approximately $444,000, exclusive of the $150,000 used to purchase Honeywell's products.

CPS experienced problems and delays with respect to the control work by reason of erroneous written instructions relating to the Honeywell's products.  (J.S. ¶ 80; Saunier Dep. at 61-63.)  Saunier recounted an incident where CPS found that Honeywell's literature was inaccurate.  (See Saunier Dep. at 61-63.)  Saunier testified that in some instances, the literature would direct an installer to install equipment one way.  When the installer attempted to complete the installation, the equipment did not properly function.  Saunier testified that upon notifying Honeywell at its 1-800 number, the Honeywell employees indicated that the literature was wrong.  (Id.)  CPS did not identify the specific literature that was inaccurate or otherwise defective.  (Id.; J.S. ¶ 31.)  Amato believed that CPS employees were not properly trained to do the programming work related to the control system.  (Amato Dep. at 43-44.)

In February 2003, Limbach sent Rost letters indicating that the control system work was behind schedule.  (Pl.'s Exs. 15,16.)  In a letter dated February 13, 2003, Limbach project manager, Greg Nastal ("Nastal"), advised Rost that

> [Limbach] has provided the notification required for default on Subcontract Number 4009-01.  We are proceeding to complete the controls scope of work, identified in the Subcontract referenced above, by any means necessary.  The costs associated with the completion of this work will be back charged to [Rost].

(Pl.'s Ex. 15.)[2]  On February 21, 2003, Nastal wrote Rost another letter notifying Rost that there had been no "remedy of the problem addressed in [the] letter of February 13, 2003."  (Pl.'s Ex.

---

[2] There is no evidence of record with respect to the content of Subcontract Number 4009-01.  The court has not been provided with a copy of the document and the parties have made only passing references to the document.  For purposes of deciding the summary judgment motion, and based upon the context of certain references to Subcontract Number 4009-01, the court assumes that this document embodies the agreement between Rost and CPS relating to the control system.

16.)  Nastal informed Rost that the February 21, 2003 letter served as "notification of breach of contract."  (Id.)  Each of these letters was forwarded to Honeywell.  (Pl.'s Ex. 4.)

By letter dated February 26, 2003, Rost informed Keller that CPS had failed to complete properly and timely the control system work as determined by both Limbach and Rost.  (Pl.'s Ex. 4; J.S.¶ 82.)  In its letter, Rost advised Keller that CPS had not remedied problems identified in prior notifications directed to CPS.  Specifically, Rost stated:

> The inability of [CPS] to respond in a timely manner to meet the project schedule requirements has forced [Rost] into a position where we must claim breach of contract on the part of [CPS]. [Rost] hereby notifies [Honeywell] that in accordance with the executed Limbach Agreement letters dated August 23, 2000 and, March 23, 2001, [Honeywell] is to immediately assume the obligations of [CPS] under the Subcontract and complete the work in a timely manner to meet the project schedule requirements.

(Pl.'s Ex. 4.)

In a March 27, 2003 memorandum directed to Drew Logan of CPS, however, Amato indicated that he was "pleased to see that the control system is closed [sic] to completion."  (Pl.'s Ex. 10.)  Amato further indicated that the control system was coming together well.  (Id.)

Dick expressed concerns about the quality and status of the control system work as well.  (Def.'s Ex. I.)  On April 24, 2003, Todd Anderson ("Anderson"), MEP coordinator for Dick, wrote a letter to Walter Daniels ("Daniels"), Limbach operations manager, to express concerns related to the control system work.  (Id.)  Anderson's letter indicated that, although CPS had previously reported that the majority of the  system was completed and operational, a subsequent inspector found that there were problems with the system.  (Id.)  Anderson also indicated that Amato's reports regarding the control system work were brief and contained some inaccuracies.  (Id.)  Anderson requested that Limbach address the problems with the control system work.  (Id.)

9

Anderson's letter indicated that the Center claimed that Dick was in default because of incomplete building maintenance system work, which included the control system.  (Id.; J.S. ¶ 19.) The Center required Dick to remedy the alleged default. (Id.)

In a June 30, 2003 email directed to Keller, Amato discussed problems that Dick and its subcontractors were having with respect to the Project.  (Pl.'s Ex. 10.)  Amato discussed problems related to the control system work and with the software.  Amato stated that he had completed about 50% of the software in the previous year.  (Id.)

On July 1, 2003 Daniels sent Keller a letter addressing problems with CPS and demanding that Honeywell take action.  (Pl.'s Ex. 12.)  The letter provided:

> CPS failed to complete and deliver the controls portion of the referenced project. We are now several months late delivering a schedule with severe damage penalties, and still counting.  Dick Corporation hired Automated Control Solutions from Pittsburgh at $130.00/straight time plus expense to correct and complete the controls.  The delay and labor cost of these problems are significant, not to mention potential collateral damages.  Limbach selected CPS for this project based on your guarantee that Honeywell would provide the support necessary to insure the controls installation success, letters attached.  The project is not a success, CPS did not meet the contract requirements and our many requests to you for support fell on deaf ears.  Honeywell didn't stand behind the 3/23/2001 agreement signed by you and Mark Shaffer.  Because Honeywell did not live up to the agreement Limbach will seek to recover from Honeywell all cost incurred through the CPS failure, including but not limited to back charges for Honeywell Technicians, schedule impacts, delay direct cost, and related consequential cost.

(Id.)  Honeywell did not respond to demands made on it by Limbach or Rost to complete CPS's subcontract. (J.S.¶ 60; Pl.'s Ex. 4.)  Keller was aware of letters from Limbach and Rost relating to problems with the control system. (J.S. ¶ 77.)  Keller did not understand how it was that CPS

was in default (Deposition of Michael Keller, Volume II at 48.) and understood that CPS was still working on the project. (Id.)

Saunier testified that CPS did not stop working on the Project until the control system was either completed or substantially completed. (J.S. ¶¶ 17, 67.)  Saunier further testified that at the time CPS left the project, the control system was sufficiently completed such that the Center was opened to the public. (J.S. ¶ 68.)  Saunier indicated that CPS was not removed from the Project at any time.[3]  (J.S. ¶ 17.)  By way of letter dated July 22, 2003, Emil Pohodich ("Pohodich"), on behalf of Rost, notified Keller that CPS had defaulted on its subcontract and was removed from the Project.  (Pl.'s Ex. 4.)  Pohodich further notified Keller that Rost intended to complete the work required under its subcontract with Limbach and requested Honeywell assume CPS's obligations in accordance with the August 2000 Letter Agreement.  Finally, Pohodich informed Keller that CPS had defaulted and was removed from the site.  The letter again requested that Honeywell assume and complete the obligations of CPS.  (Id.)

By letter dated September 25, 2003, Rost informed Honeywell that it had received another notice from Limbach relating to CPS's deficient performance on the Project.  (Id.)  The letter indicated that there was "a long line of letters from Limbach and Rost to [Honeywell] requesting that Honeywell step in and solve the problems created by CPS on this project."  (Id.)

CPS was not paid the entire amount under its subcontract with Rost.  (J.S. ¶ 18.)  Rost withheld certain amounts under the subcontract because it claimed that CPS failed to complete

---

[3]Although Saunier denies that CPS was removed from the Project, Great American, in a later response to Honeywell's statement of facts, admits that CPS was removed from the Project. (J.S. ¶¶ 25, 68.)

the required work.  (Id.)  Rost indicated that it planned to use the withheld amounts to pay

Honeywell to complete the control system work.  (Id.)

**Honeywell Enters into Subcontract to Complete Controls Work**

Sometime in April 2003, Dick contacted Honeywell's Pittsburgh office and hired

technicians to perform an assessment of the control system work at the Project.  (J.S. ¶ 20.)

Honeywell assigned two technicians to perform the assessment.  (Id.)  Honeywell and Dick

entered into a subcontract agreement whereby Honeywell agreed to assess and complete the

control system work (the "Remedial Subcontract").  (Def.'s Ex. I; J.S. ¶ 21.)  The Remedial

Subcontract provided that Honeywell would perform the controls work for "$130 per hour, plus

applicable itemized expenses." (Def.'s Ex. I.)  Keller testified that the $130 per hour rate likely

included a profit component.  (J.S. ¶ 73.)  The Remedial Subcontract was dated May 19, 2003,

but was not executed by Honeywell until August 4, 2003.  (Def.'s Ex. J.)  The Remedial

Subcontract was not executed by Dick until August 14, 2003.  (Id.)  The Remedial Subcontract

provided that it was "not to supersede any contract, purchase order and/or understanding by or

between Honeywell, and [CPS], [Rost] and/or Limbach."  (Id.)  The Remedial Subcontract

provides that it "shall be governed by the Laws of the State in which the project is located."

(Def.'s Ex. J.)  Honeywell did not report to either Limbach or Rost during its performance under

the Remedial Subcontract with Dick.  (J.S. ¶ 70.)

Honeywell believes that the work it subsequently performed pursuant to the Remedial

Subcontract was remedial in nature and included work that was required in order to complete the

Project.  (J.S. ¶¶ 22, 79.)  Pursuant to its agreement with Dick under the Remedial Subcontract,

Honeywell invoiced Dick for a total of $388,755.84.  (Def.'s Ex. K; J.S. ¶ 23.)  Dick paid

Honeywell in full for the work Honeywell performed pursuant to the Remedial Subcontract between Dick and Honeywell.  (J.S. ¶ 24.)

Limbach and Rost knew that Dick had hired Honeywell to complete the control system work after CPS was removed from the Project.  (J.S. ¶ 25.)  Both Limbach and Rost received copies of Honeywell's invoices, which were submitted to Dick for payment.  (Id.)  After Dick paid Honeywell, it back charged Limbach for the costs. (J.S. ¶ 61.)  Limbach then back charged the amounts paid to Rost.  (Id.)

**The Claims**

Dick, Limbach, Rost, Great American and CPS (the "litigating parties") asserted claims against each other relating to issues that arose during the completion of the Project.  (J.S. ¶ 27.) Great American and Rost settled all claims with Dick, Limbach and CPS.  (Def.'s Ex. L; J.S. ¶ 28.)  The litigating parties excluded from the settlement agreement any claims that they might have had against Honeywell.  (J.S. ¶ 28.)  Great American received settlement releases from each of the litigating parties and the litigating parties assigned to Great American any claims that the parties may have had against Honeywell.  (Id.)

On June 22, 2005, Great American asserted claims against Honeywell for breach of contract, unjust enrichment, breach of express warranty, breach of the implied warranty of merchantability and breach of the implied warranty of fitness for a particular purpose.  (J.S. ¶ 29; see Compl.)  Additionally, Great American withheld $11,762.18 from Honeywell on another unrelated project.  (J.S. ¶ 32.)  Great American's sole reason to withhold the funds was as a set-off against its claims related to Honeywell in the instant matter.  (J.S.  ¶¶ 32-33.)

13

*Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  Id. at 249.  The court is to draw all reasonable inferences in favor of the nonmoving party.  El v. Southeastern Pa. Transp. Auth., 479 F.3d 232 (3d Cir.2007)("In considering the evidence, the court should draw all reasonable inferences against the moving party.").  The United States Court of Appeals for the Third Circuit recently stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

Id. at 238.

*Analysis*

Defendant seeks summary judgment in its favor with respect to each of the five claims asserted by plaintiff, i.e, breach of contract, unjust enrichment, breach of express warranty, breach of implied warranty of merchantability and breach of implied warranty of fitness for a particular purpose.  Defendant also seeks summary judgment in its favor with respect to its counterclaim against plaintiff.  Each of plaintiff's claims will be discussed and then the defendant's counterclaim will be considered.

## I.      Breach of Contract Claim

Great American, in its complaint, as an assignee of Dick, Limbach and Rost, asserts a breach of contract claim against Honeywell alleging that Honeywell "guaranteed the performance of CPS" in an effort to assure that CPS would purchase the required products from Honeywell. (Compl. ¶ 43.)  Great American alleges that when the control systems malfunctioned, Honeywell refused to honor its alleged guarantee.  (Compl. ¶ 46.)

### A.      Mutual Mistake of Law

Great American's breach of contract claim is based upon Honeywell's failure to honor the Letter Agreements and assume CPS's obligation when CPS was either removed from or left the Project.  Honeywell argues that plaintiff's claim for breach of contract must fail because the parties were mutually mistaken about a key contract term and the subject contract is therefore void.  Honeywell asserts that both Limbach and Honeywell believed that the August 2000 and March 2001 letter agreements provided bond protection for Honeywell in the event that CPS defaulted under its subcontract agreement.  Honeywell posits that the bond could not, as a matter

15

of law, have provided Honeywell the sought after protection.  Honeywell argues that the parties

operated under a mutual mistake of law in forming the Letter Agreements.  Accordingly, asserts

Honeywell, the Letter Agreements must be found void as a matter of law.

   Great American counters that because any mistake was a mistake of law, Honeywell must

prove by clear and convincing evidence that all parties to the Letter Agreements were operating

under the same mistake of law.  Otherwise, argues Great American, any mistake resulted from

negligence on the part of the Honeywell, the mistaken party, and the agreements should be

enforced.

   It is well settled that "agreements made and acts done under a mistake of law are, if not

otherwise objectionable, generally held valid and obligatory."  Harner v. Price, 17 W.Va. 523

(1880); Sanders v. Roselawn Memorial Gardens, Inc., 159 S.E.2d 784, 794 (W.Va. 1968); see

Robinson v. Fairmont Trust Co., 153 S.E. 909, 911 (W.Va. 1930); Webb v. Webb, 301 S.E.2d

570, 574 (W.Va. 1983).[4]  Where parties are laboring under a mistake of law,  the parties are not

permitted to avoid the obligations previously undertaken.  Webb v. Webb, 301 S.E.2d at 574.

The difference between a mistake of fact and a mistake of law, however, is often difficult to

ascertain.  See Webb, 301 S.E.2d 570.  As the court in Webb discussed,

> [a] mistake of fact consists of an unconscious ignorance or forgetfulness of a
> material fact, past or present, or of a mistaken belief in the past or present
> existence of a material fact which did not or does not actually exist.  A mistake of
> law, on the other hand, consists of a mistaken opinion or inference arising from an
> imperfect or incorrect exercise of judgment upon the facts as they really are and
> occurs when a person, having full knowledge of the facts, is ignorant of or comes
> to an erroneous conclusion as to the legal effect of his acts.

---

[4]The parties do not dispute that West Virginia law is applicable and this court will
therefore discuss the law of West Virginia.

Id. at 574-75 (citing Virginia Iron, Coal & Coke Co. v. Graham, 98 S.E. 659 (W.Va. 1919);

Briggs v. Watkins, 70 S.E. 551 (W.Va. 1911); Shriver v. Garrison, 4 S.E. 660 (W.Va. 1887);

Harner v. Price, 17 W.Va. 523).  Making the distinction between a mistake of law and a mistake

of fact is difficult because it is common for a mistake of fact to have legal consequences, making

it appropriate for a party to argue that any mistake was a mistake of law.  Webb, 301 S.E.2d at

575.  Therefore, the factual and legal circumstances surrounding each case must control when

determining whether an alleged mistake relating to the execution of a written document is a

mistake of law or a mistake of fact.  Id.

   In the instant matter, Honeywell argues that it was laboring under a mistake of law when

it entered into the August 2000 and March 2001 letter agreements.  Honeywell asserts that when

it entered into the Letter Agreements with Limbach, it believed that the Great American surety

bond would provide it protection in the event that CPS defaulted and the balance under the

subcontract was insufficient to compensate Honeywell for its work.  Honeywell is correct in

understanding that the Letter Agreements indicate that Honeywell would look to Great American

to compensate it for its work if the balance under the subcontracting agreement was insufficient

to compensate Honeywell.  This argument, however, does not create a difficult decision for this

court.

   Assuming Honeywell's arguments rest on voiding the Letter Agreements as a result of a

mistake of law, West Virginia law is clear that where a party is laboring under a mistake of law,

the party does not have a right to avoid its obligations under the contract.  Where the party

operates under a mistake of law, that party is still bound to meet its obligations under the

contract.  Honeywell may not void the Letter Agreements as a result of its operating under a

mistake of law.

To the extent Honeywell argues that the alleged mutual mistake here is a mistake of fact,

Honeywell bears the risk of the mistake unless it can prove that the mistake was mutual and

material and that it could not have obtained knowledge of the fact.  The doctrine of mutual

mistake provides that "a contract is reformable or voidable if it can be shown that the parties

mutually erred about a basic fact that is material to their agreement."  McGinnis v. Clayton, 312

S.E.2d 765, 769 (W.Va. 1984).  The law is clear that "one who enters into a contract or performs

some act while laboring under a mistake of fact is entitled to have the transaction or the act set

aside in a court of equity."  Webb, 301 S.E.2d at 574; see Capitol Chrysler-Plymouth, Inc., 532

S.E.2d 43, 49 (W.Va. 2000).  A contract, which is founded in a mutual mistake of fact

constituting the basis or essence of the agreement, will be voided.  Bluestone Coal Co. v. Bell, 18

S.E. 493 (W.Va. 1893).

In discussing the nature of a "mistake of fact", the court in McGinnis reasoned that "a

mutual mistake as to a material assumption which underlies a contractual agreement is sufficient

grounds to find that agreement void."  McGinnis, 312 S.E.2d at 769.  The Restatement (Second)

of Contracts provides:

> [w]here a mistake of both parties at the time a contract was made as to a basic
> assumption on which the contract was made has the material effect on the agreed
> exchange of performances, the contract is voidable by the adversely affected party
> unless he bears the risk of the mistake . . . .

RESTATEMENT (SECOND) OF CONTRACTS § 152(1) (cited with approval in Orlandi v. Goodell,

760 F.2d 78, 81 (4th Cir. 1985); McGinnis, 312 S.E.2d at 769).  Not every mistake of fact,

however, will cause a contract to be voidable.  In order for a contract to be voidable, the mistake

of fact must be related to a fact that is material in the matter.  See Eye v. Nichols, 70 S.E.2d 264,

267 (W.Va. 1952).   In Eye, the Supreme Court of Appeals of West Virginia opined that a

> fact not known must be material in the matter.  And, even where the fact is
> material, that alone is not always enough.  "It must be such as the party could not
> by reasonable diligence get knowledge of when he was put upon inquiry; for if, by
> such reasonable diligence, he could have obtained knowledge of the fact, equity
> even will not relieve him, since that would be to encourage culpable negligence."

Id. (quoting Harner v. Price, 17 W.Va. 523).

> [I]t is generally recognized that a mistake as to the legal effect of a contract,
> though a mistake of law, will be treated as a mistake of material fact where the
> mistake is mutual, or common to all parties to the transaction, and results in a
> written instrument which does not embody the 'bargained-for' agreement of the
> parties.

Brannon v. Riffle, 475 S.E.2d 97, 100-101 (W.Va. 1996) (citing Webb v. Webb, 301 S.E.2d 570,

575 n. 5 (1983)).  It is well settled, however, that "[a] party cannot avoid the legal consequences

of his actions on the ground of mistake, even a mistake of fact, where such mistake is the result

of negligence on the part of the complaining party."  Webb, 301 S.E.2d at 576 (citing Eye v.

Nichols, 70 S.E.2d 264; Taylor v. Godfrey, 59 S.E. 631 (W.Va. 1907); Pennypacker v. Laidley,

11 S.E. 39 (W.Va. 1890); Harner v. Price, 17 W.Va. 523); see also McGinnis v. Clayton, 312

S.E.2d 765, 770 (W.Va. 1984).

Here, Honeywell is a corporation engaged in the business of providing control systems

equipment, literature explaining how to install and use that equipment, programming, software

and technical support to its customers.  The parties to the Letter Agreements were corporations

engaged in a multi-million dollar construction project.  The Letter Agreements obligated

Honeywell to assume CPS's obligations in the event that CPS failed timely or adequately to

19

complete the Project.  Honeywell was well aware of the nature and scope of the project and, indeed, sold CPS the products for the control system.  Knowing that it could, at any time, be responsible for completing the control system, it would have been prudent for Honeywell to obtain legal advice about whether the surety bond would protect Honeywell.  Further, Honeywell could have directed inquiries to Great American about whether the surety bond would protect Honeywell in the event that Honeywell had to complete the Project.  Under those circumstances, it would be reasonable for a finder of fact to conclude that Honeywell never contacted Great American regarding the surety bonds in issue.  Simply put, a reasonable jury could find that Honeywell failed to take reasonable measures to make sure that the bond would protect Honeywell in the event that CPS defaulted.  Summary judgment cannot be granted in favor of Honeywell under that argument because a reasonable jury could conclude that Honeywell's own negligence caused any mistake.

**B.     Condition Precedent**

As an alternate basis for summary judgment to be granted in its favor with respect to the breach of contract claim, Honeywell asserts that Limbach did not declare that CPS was in default on the subcontract.  Therefore, Honeywell argues, its obligation to assume the subcontract was not triggered.   Honeywell's arguments ignore the evidence of record in this case.

In addition to the general rules of contract construction discussed above, West Virginia courts have held that "under the broad liberty of contract allowed by law, parties may make performance of any comparatively, or apparently trivial and unimportant covenant, agreement, or duty under the contract a condition precedent, and, in such case, the contract will be enforced or dealt with as made."  Wellington Power Corp., 614 S.E.2d 680, 684 (W.Va. 2005) (citing

20

<u>Watzman v. Unatin</u>, 131 S.E. 874 (W.Va. 1926)); <u>Adams v. Guyandotte Valley Ry. Co.</u>, 61 S.E. 341 (W.Va. 1908). Under West Virginia law, a party seeking to avoid obligations imposed by a condition precedent has a heavy burden. <u>See</u> <u>Wellington Power Corp.</u>, 614 S.E.2d 680.

The Letter Agreements contain a clear and unambiguous condition precedent to Honeywell's obligation to complete CPS's subcontract. The parties do not dispute that default, as determined by Limbach, was the condition precedent. The parties dispute, however, whether the condition precedent was satisfied. Honeywell argues that the condition precedent was never satisfied because it is not clear from the record that Limbach determined that CPS defaulted on its subcontract. Great American points to a plethora of evidence in the record which indicates that CPS defaulted on its subcontract and argues that the condition precedent was satisfied.

Beginning in February 2003, Limbach notified Rost that the control system work was behind schedule. In its February 21, 2003 letter, Limbach notified Rost that CPS had not remedied problems with the control system. Limbach explicitly advised Rost that its letter served as "notification of breach of contract" between Rost and Limbach. (Pl.'s Ex. 16.) Rost forwarded Limbach's letters to Keller on February 26, 2003. In its letter to Keller, Rost advised Keller that CPS's failure to complete the project in a timely manner had forced Rost to claim breach of the subcontract between Rost and CPS. Rost demanded that Honeywell immediately assume CPS's obligations as previously agreed in the Letter Agreements. A reasonable jury could conclude that by reason of the letters written in February 2003 Limbach determined that CPS had defaulted on the subcontract related to the control system work.

This court notes that Keller testified that he did not understand how it was that CPS was in default. The mere fact that Keller did not understand how CPS would be in default does not

negate the existence of the letters written by Limbach and Rost and forwarded to Keller's attention.  In as early as February 2003, Honeywell received copies of Limbach's letters indicating that Rost and, thus, CPS were in default.  Keller acknowledges that he received the letters, but does not recall that he responded to the letters.  Additionally, in an email dated June 30, 2003, and directed to Keller, Amato, a fellow Honeywell employee, informed Keller that Dick and its subcontractors were having problems with CPS's performance on the Project.  Amato detailed the nature of the problems with the control system.  While the court understands that the June 30, 2003 email was dated after the Remedial Subcontract (dated May 19, 2003), the email is further notification to Keller from a fellow Honeywell employee that CPS may have been in default at that time.  Under those circumstances, a reasonable jury could find Keller's contention - that he did not understand how it was that CPS was in default - not credible in light of Keller, himself, receiving letters detailing the reasons for the default and receiving communications from Amato about CPS's failure to perform.

The court also notes, and Honeywell relies on, Saunier's testimony during his deposition to the effect that CPS was never removed from the Project.  If in fact, CPS was never removed from the project as Saunier testified and Honeywell asserts, the condition precedent may not have been met.  There is evidence of record, however, to support that CPS was removed from the Project.

First, as discussed above, Limbach and Rost began writing letters regarding CPS's default as early as February 2003.  A reasonable reading of the letters indicates that Limbach and Rost had, prior to the writing of the letters, addressed their concerns to CPS and that CPS failed to correct the problems with the control system.  Although Saunier adamantly denies that CPS was

22

removed from the Project, there is evidence in the record that Honeywell completed the project and that CPS either was removed from or left the Project.  At best, there exists an issue of fact to be resolved by the jury with respect to whether the condition precedent was met.

Based upon the evidence of record, a reasonable juror may infer that the various communications directed to Rost and Honeywell were sufficient to establish that CPS was in default of its subcontract relating to the control system work.  Honeywell's motion for summary judgment will be denied with respect to Great American's claims for breach of contract.

### C.     Great American's Interpretation Regarding Work Without Compensation

In its complaint, Great American implies that Honeywell was obligated to assume CPS's subcontract agreement without receiving compensation for its work.  Honeywell argues that the Letter Agreements are not ambiguous and indicate that Honeywell was to be compensated for any work it performed pursuant to the Letter Agreements.  Great American does not directly address this argument.  Presumably, Great American failed to address the argument because its position is unavailing.

Under West Virginia law, in order to have a legal contract, the following factors must be present: competent parties, legal subject matter, valuable consideration and mutual assent. Wellington Power Corp. v. CNA Surety Corp., 614 S.E.2d at 684 (citing Virginian Export Coal Co. v. Rowland Land Co., 131 S.E. 253 (W.Va. 1926)).  "A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." Id. (citing Cotiga Development Co. v. United Fuel Gas Co., 128 S.E.2d 626 (W.Va. 1962)).  If a

contract is ambiguous, however, it is subject to construction. Tawney v. Columbia Natural

Resources, LLC, 633 S.E.2d 22, 28 (W.Va. 2006). "[T]he term ambiguity is defined as language

'reasonably susceptible of two different meanings' or language 'of such doubtful meaning that

reasonable minds might be uncertain or disagree as to its meaning.'" Id. (quoting Payne v.

Weston, 466 S.E.2d 161, 166 (W.Va. 1995) quoting Shamblin v. Nationwide Mut. Ins. Co., 175

W.Va. 337, 332 S.E.2d 639 (1985)). Disagreement between the parties as to the construction of

a contract does not necessarily mean that the contract is ambiguous. Flanagan v. Stalnaker, 607

S.E.2d 765, 769 (W.Va. 2004) (citing Supervalue Operations v. Center Design, 524 S.E.2d 666

(W.Va. 1999)). "The question as to whether a contract is ambiguous is a question of law to be

determined by the court." Id. Regardless of any construction or interpretation by the court, the

court will not interpret a contract in a manner that creates an absurd result. Dunbar Fraternal

Order of Police, Lodge #119 v. City of Dunbar, 624 S.E.2d 586 (W.Va. 2005) (citing Ashland

Oil, Inc. v. Donahue, 223 S.E.2d 433 (W.Va. 1976)).

It is clear from the evidence of record that the intent of the parties was that Honeywell

would be compensated for any work it performed in the event CPS defaulted on its subcontract

with Rost. Whether compensation for Honeywell's work would come from the balance of CPS's

subcontract or the Great American bond depended upon the amount of work Honeywell was

required to perform and the amount available for payment under the subcontract. Great

American has suggested that Honeywell was required to complete any work not completed or

inadequately completed by CPS without the benefit of compensation. The August 2000 letter

agreement provides: "[a]s an obligee under the bond, Honeywell can then pursue the bonding

company for its costs beyond those costs covered by the remaining Subcontract balance between

Comfort & Process Solutions and Limbach Company." The Letter Agreements contemplated that Honeywell would be compensated for any work it performed as a result of a CPS default. This court cannot construe the Letter Agreements to mean Honeywell was to complete CPS's subcontract for free because to do so the court would create an absurd result.


## II.     Unjust Enrichment Claim

In its complaint, Great American alleges that Honeywell was unjustly enriched because it received additional payment for "performing repair and corrective work that it was already obligated to perform or should have performed at no additional charge" (Compl. ¶ 55.) Great American also alleges that Honeywell was unjustly enriched because it inflated the amounts it charged for performing the repair and corrective work. (Compl. ¶ 56.) Honeywell argues that Dick did not reserve any rights when it paid Honeywell pursuant to the Remedial Subcontract, which resulted in Dick waiving its rights to complain that it overpaid Honeywell. Honeywell's arguments, however, ignore the evidence of record which presents a material question of fact with respect to whether Great American has a valid unjust enrichment claim.

Under West Virginia law, where a party receives and retains benefits under circumstances that it would be inequitable and unconscionable to permit the party receiving the benefit to avoid payment, the law of unjust enrichment requires the party receiving the benefit to pay the reasonable value of the benefit. Realmark Development v. Ranson, 542 S.E.2d 880 (W.Va. 2000) (citing Copley v. Mingo County Board of Education, 466 S.E.2d 139 (W.Va. 1995)). In order "to be entitled to equitable relief for unjust enrichment, a party must show that a payee received money to which he was not entitled and that the payment was the result of a mistake."

<u>Absure, Inc. v. Huffman</u>, 584 S.E.2d 507, 510 (W.Va. 2003) (citing <u>Prudential Insurance</u>
<u>Company of America v. Couch</u>, 376 S.E.2d 104 (W.Va. 1988)).  For purposes of unjust
enrichment, a mistake is "some unintentional act, omission or error arising from
unconsciousness, ignorance, forgetfulness, imposition or misplaced confidences."  <u>Id.</u> (citing
<u>Taylor v. Godfrey</u>, 59 S.E. 631). The cause of any "mistake" is not as important as the existence
of the mistake.  <u>Id.</u>  Even where a mistake arises out of one party's negligence, that party is not
necessarily precluded from asserting his rights under the law of unjust enrichment.  Instead, the
court will consider whether the negligence has adversely affected the opposing party.  <u>Id.</u>  "[A]"
third party connected with a transaction may seek restitution where there is unjust enrichment
which resulted from the third party satisfying an obligation of the unjustly enriched party."
<u>Absure</u>, 584 S.E.2d at 511 (citing <u>Prudential Insurance Company of America v. Couch</u>, 376
S.E.2d 104).

    Honeywell argues that because Dick did not reserve any rights when it paid Honeywell
pursuant to the Remedial Subcontract, Dick waived its rights to complain that it overpaid
Honeywell and consequently as Dick's assignee, Great American cannot raise this claim.  Great
American counters that the factual evidence supporting its breach of contract claim also supports
an unjust enrichment claim and presents a genuine issue of material fact.  On this point, Great
American is correct.

    The evidence of record indicates that CPS was charged with installing a control system to
regulate, among other things, the heating, air conditioning and ventilation at the Center.  At the
time CPS sought the subcontract to perform the subject work, it had been in business for less
than one year and had never performed a project of this magnitude.  Honeywell assured Limbach,

which had concerns about using CPS, that in the event CPS was unable to meet its obligations under its subcontract, Honeywell would assume those obligations.  The subcontract between Rost and CPS was for $444,000, excluding the cost of the products.

During the course of its performance, CPS drew support from Honeywell in completing the control system.  Honeywell's employee, Amato, completed between 40% to 90% of the control system work.  Although Amato stated that the CPS employees were not properly trained to handle a job of this size, on March 27, 2003, Amato indicated that the control system was "coming together well."  Amato further stated that the control system was close to completion. At the same time, Dick, Limbach and Rost were complaining that the control system programming was faulty.  As Amato had completed at least 40% and as much as 90% of the programming related to the control system, any problems with the programming may have been as a result of Amato's performance.

By April 2003, Dick contacted Honeywell's Pittsburgh office and hired technicians to perform an assessment of the control system work that Amato indicated was close to completion. The Honeywell technicians found that the control system was inadequate.  Honeywell's assessment ultimately led to Honeywell securing a contract directly with Dick to complete work as defined in the Remedial Subcontract.  Under the Remedial Subcontract, Honeywell billed Dick more than $388,000.  This is hardly indicative of a job that was close to completion, coming along nicely or completed to the point that the Center was open to the public.  The court also notes that Honeywell obtained the additional $388,000 while it may have been obligated to perform the completion work pursuant to the Letter Agreements and not under a new agreement with Dick.

27

Under these circumstances, it is possible that a jury could find that it would be unjust to allow Honeywell to keep all $388,000 it received as payment pursuant to the Remedial Subcontract. Viewing the facts in the light most favorable to Great American, a reasonable jury may find that allowing Honeywell to retain all of the money paid by Dick is either inequitable or unconscionable. A jury might also find that it is inequitable and unconscionable to allow Honeywell to retain all $388,000 where it represented, as late as March 27, 2003, that the work was nearly complete and then sent technicians the following month to opine that the control system was inadequate. After reviewing all disputed facts in the light favorable to the nonmoving party, Great American, and drawing all reasonable inferences in favor of Great American, this court concludes that it cannot grant summary judgment with respect to plaintiff's unjust enrichment claims. Accordingly, summary judgment is denied.

## III.   Breach of Warranty Claims

In counts three, four and five, Great American alleges that Honeywell breached an express warranty, an implied warranty of merchantability and a warranty of fitness for a particular purpose. Great American alleges that Honeywell's products were defective. Honeywell asserts that Great American failed to point to any specific defect in its products and, therefore, Great American should not prevail on any of its breach of warranty claims. Each warranty claim will be discussed.

### A.   Breach of Express Warranty

Pursuant to West Virginia Code section 46-2-313, an express warranty is created where a seller of goods makes or provides:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

W.Va. Code § 46-2-313.  In creating an express warranty, it is not necessary that a seller "use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty." Id. § 46-2-313(2).  Instead, a seller may create an express warranty by "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." Id.  In order to succeed on its claim for breach of express warranty, Great American must prove that Honeywell made an affirmation of fact, promise or provided a description relating to the products Honeywell sold, which became part of the basis of the bargain between Honeywell and CPS.  Great American must also prove that the products did not conform to the affirmation, promise or description.

Upon close analysis of the record, there is not a scintilla of evidence relating to an affirmation, promise or description relating to any nonconforming goods.  This court undertook painstaking efforts to review ever work order ticket, invoice, requisition and all deposition testimony to identify the existence of any affirmation, promise or description relating to any non-conforming goods.  Great American failed to adduce any evidence of an affirmation, promise or description that may give rise to an express warranty.  Having found no evidence of an express warranty and being presented with none by Great American, the court concludes that even

29

viewing the evidence in the light most favorable to Great American, no reasonable jury could find that Honeywell made an express warranty relating to the control system equipment.  This court must, therefore, grant summary judgment in favor of Honeywell with respect to Great American's breach of express warranty claim.

> **B.   Breach of Implied Warranty of Merchantability and the Implied Warranty of Fitness for a Particular Purpose**

Great American asserts two claims under the theory of breach of implied warranties.  In count four of its complaint, Great American alleges a claim for breach of the implied warranty of merchantability.  Count four asserts that Honeywell's goods were defective and not fit for the ordinary purposes for which they were intended.  (Compl. ¶ 67.)  Great American asserts that Honeywell's goods failed to control properly the heating, air conditioning and ventilation ("HVAC") system.  (Id. ¶ 68.)  Count four further asserts that the literature relating to the HVAC system was defective.  (Id. ¶ 70.)  Similarly, count five asserts a claim for breach of the implied warranty of fitness for a particular purpose.  In count five, Great American asserts that Honeywell's goods failed to meet the particular control system requirements for the Project. (Id. ¶ 77.)

Honeywell moves for summary judgment on the ground that throughout the course of discovery, Great American failed to point to any defect in the goods Honeywell provided to CPS.  Great American argues discovery revealed that Honeywell, through its employee, Amato, completed between 40% to 90% of the programming of the control system.  When hired by Dick to conduct remedial work, Honeywell's technicians found that the original programming was faulty and it had to be substantially redone.  Pursuant to the Remedial Subcontract, Honeywell

charged Dick in excess of what would have been payable under CPS's subcontract.  Great

American argues, therefore, that any problems with the programming were caused by Amato's

faulty work.

Additionally, Great American argues that Honeywell's literature relating to the products it

sold for the control system was inaccurate.  Great American asserts that this inaccurate literature

caused delays and errors during the programming of the control system.  For these reasons, Great

American alleges that there exists a material issue of fact with respect to whether Honeywell

breached either of the implied warranties and summary judgment should not be granted.

Under West Virginia law, an implied warranty of merchantability is created if the seller of

products is a merchant with respect to goods of that kind.  W.VA. CODE §  46-2-314 (1963).

Section 46-2-314 provides:

> (1) Unless excluded or modified (section 2-316), a warranty that the goods shall
> be merchantable is implied in a contract for their sale if the seller is a merchant
> with respect to goods of that kind. . . .
>
> (2) Goods to be merchantable must be at least such as
> (a) pass without objection in the trade under the contract description; and
> (b) in the case of fungible goods, are of fair average quality within the description;
> and
> (c) are fit for the ordinary purposes for which such goods are used; and
> (d) run, within the variations permitted by the agreement, of even kind, quality
> and quantity within each unit and among all units involved; and
> (e) are adequately contained, packaged, and labeled as the agreement may require;
> and
> (f) conform to the promises or affirmations of fact made on the container or label
> if any.
>
> (3) Unless excluded or modified (section 2-316) other implied warranties may
> arise from course of dealing or usage of trade.

W.Va. Code § 46-2-314 (1963).  A warranty of merchantability is implied in any contract for sale of goods where the seller is a merchant with respect to goods of that kind and assures the buyer that, among other things, goods are fit for ordinary purposes for which they are used.  Id.; Mountaineer Contractors, Inc. v. Mountain State Mack, Inc., 168 S.E.2d 886 (W.Va. 1980).  The implied warranty of merchantability arises by operation of law regardless of an intention on the part of the seller to create an implied warranty.  Id.  To succeed on a claim for breach of the implied warranty of merchantability, Great American must prove that 1) Honeywell is a merchant with respect to the subject goods; 2) Honeywell agreed to sell and CPS agreed to buy the subject goods for valuable consideration; 3) an implied warranty of merchantability arose; 4) the subject goods were not fit for the ordinary purposes for which the goods are used; and 5) as a proximate result thereof, CPS suffered damages.  Mountaineer Contractors, 268 S.E.2d at 891 n.2.

The implied warranty of merchantability and the implied warranty for fitness of purpose may coexist as the two warranties are not mutually exclusive.  Jones, Inc. v. W.A Wiedebusch Plumbing & Heating Co., 201 S.E.2d 248 (W.Va. 1973).  With respect to the implied warranty of fitness for a particular purpose, West Virginia Code section 46-2-315 provides:

> [w]here the seller at the time of contracting has reason to know any particular
> purpose for which the goods are required and that the buyer is relying on the
> seller's skill or judgment to select or furnish suitable goods, there is unless
> excluded or modified under the next section an implied warranty that the goods
> shall be fit for such purpose.

W.Va. Code § 46-2-315 (1963).  The implied warranty of fitness for a particular purpose does not come into being unless a buyer relies on the seller's skill or judgment in connection with the matter or goods purchased. W.Va. Code §§ 46-2-312, 46-2-314; Sylvia Coal Co. v. Mercury

Coal & Coke Co., 156 S.E.2d 1 (W.Va. 1967).  The Supreme Court of Appeals of West Virginia

relied on the comment to section 2-315 of the UCC in reaching its decision in Jones, Inc. v. W.A.

Wiedebusch Plumbing and Heating Co., 201 S.E.2d 248, 254 (W.Va. 1973).  The comment

provides:

> [u]nder this section the buyer need not bring home to the seller actual knowledge
> of the particular purpose for which the goods are intended or of his reliance on the
> seller's skill and judgment, if the circumstances are such that the seller has reason
> to realize the purpose intended or that the reliance exists. The buyer, of course,
> must actually be relying on the seller.

W.VA. CODE § 46-2-315 cmt. at 1.  In order to succeed on its claim for breach of warranty of

fitness for a particular purpose, Great American must show that 1) Honeywell, at the time of the

contracting had reason to know the particular purpose for which the good were required; 2) the

reliance by CPS upon the skill or judgment of Honeywell to select suitable goods; and 3) that the

goods were unfit for the particular purpose.  Jones, Inc. v. W.A. Wiedebusch Plumbing and

Heating Co., 201 S.E.2d at 254.

       The difficulty this court faces centers around the parties' failure to brief adequately the

legal issues relating to plaintiff's implied warranty claims.  Great American's implied warranty

claims are based on alleged faulty programming work performed by Amato and alleged

inaccurate literature.  In its briefing, Great American does not argue that the programming was

faulty inasmuch as it argues that Amato's work with respect to the program was inadequate.

Great American argues that this inadequate work caused the control system to malfunction.

Further, Great American argues that the literature relating to the control system programming

was inaccurate and caused malfunctions and delays in installation of the control system.

The parties have failed to point this court to any caselaw which supports the contention that either faulty <u>work</u> by Amato or inaccurate literature is a "good" as that term is referenced in West Viginia's Uniform Commercial Code.  This court was unable to locate any caselaw which would help this court determine whether Amato's work relating to the control system or any alleged inaccurate instructions are "goods" as contemplated by West Virginia Code sections 46-2-314 and 46-2-315.[5]   Finding no caselaw in support of Great American's position, this court will grant summary judgment in favor of defendant.  Should Great American choose to pursue its implied warranty claims, it may within twenty days from the entry of this opinion seek reconsideration of this issue.

## IV.    Honeywell's Counterclaim Against Great American

In its counterclaim against Great American, Honeywell asserts that Great American withheld $11,762 as an "offset" right.  In its motion for summary judgment, Honeywell argues that because Great American does not have a valid claim against Honeywell, Great American had no right to "offset" $11,762 from another unrelated project.  Because plaintiff's breach of contract and unjust enrichment claims have survived summary judgment, Great American may

-----

[5]The court notes that, under Pennsylvania law, the implied warranty of merchantability and the implied warranty of fitness for a particular purpose are not applicable in actions involving the rendition of services.  <u>Turney Media Fuel, Inc. v. Toll Bros., Inc.</u>, 725 A.2d 836 (Pa. Super. Ct. 1999) (citing <u>Whitmer v. Bell Telephone Co. of Pa.</u>, 522 A.2d 584, 587 (Pa. Super. Ct. 1987); <u>Stephenson v. Greenberg</u>, 617 A.2d 364, 368 (Pa. Super. Ct. 1992).  In <u>Turney</u>, the Superior Court of Pennsylvania opined that "[w]hen the transaction involves predominately the rendition of services [the installation of an HVAC system], the fact that tangible, movable goods may be involved in the performance of a contract does not bring the contract under the code." <u>Id.</u> at 840.

have offset rights against Honeywell.  Accordingly, Honeywell's motion for summary judgment is denied with respect to Honeywell's counterclaim.


### *Conclusion*

After reviewing the undisputed material facts of record, viewing all disputed facts in the light favorable to the nonmoving party, and drawing all reasonable inferences in favor of the nonmoving party, the motion for summary judgment filed by defendant Honeywell (Doc. No. 40) will be **GRANTED IN PART** and **DENIED IN PART.**  The court concludes that plaintiff adduced sufficient evidence for a reasonable jury to render a verdict in its favor with respect to its breach of contract and unjust enrichment claims and therefore defendant's motion summary judgment with respect to those claims will be **DENIED.**  Plaintiff, however, did not adduce sufficient evidence for a reasonable fact finder to render a verdict in favor of plaintiff on its breach of express warranty claim and summary judgment will be **GRANTED** in favor of defendant on that claim.  Defendant's motion for summary judgment with respect to plaintiff's implied warranty of merchantability and implied warranty of fitness for a particular purpose claims will be **GRANTED WITHOUT PREJUDICE** in favor of defendant.   Since plaintiff's breach of contract and unjust enrichment claims have survived summary judgment and, therefore, Great American may have offset rights against Honeywell, Honeywell's motion for summary judgment with respect to Honeywell's counterclaim is **DENIED.**

By the court:


  /s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated: September 28, 2007

cc:      Counsel of record

36