IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| GREAT AMERICAN INSURANCE COMPANY, | ) ) | |
|---|---|---|
| | ) | Civil Action No. 05-857 |
| Plaintiff/Counterclaim Defendant, | ) ) | |
| vs. | ) ) | |
| HONEYWELL INTERNATIONAL INC., | ) ) | |
| Defendant/Counterclaimant. | ) | |

MEMORANDUM OPINION

CONTI, District Judge

The instant case arises out of the design and construction of the Clay Center for the

Performing Arts and Sciences ("Clay Center"), a multi-use museum and cultural facility located

in Charlestown, West Virginia. Great American Insurance Company ("Great American" or

"plaintiff") commenced this action against Honeywell International, Inc. ("Honeywell" or

"defendant"), asserting claims for breach of contract, unjust enrichment, breach of express

warranty, breach of implied warranty of merchantability, and breach of implied warranty of

fitness for a particular purpose. Defendant filed a motion for summary judgment (Docket No.

40), which was granted with respect to the breach of warranty claims and denied with respect to

the claims of breach of contract and unjust enrichment (Docket No. 51). On February 2, 3, 4, 5,

and 10, 2009, this court heard evidence and argument with respect to the remaining claims

during a bench trial. On March 20, 2009, defendant and plaintiff filed proposed findings of fact

and conclusions of law.

Pursuant to Federal Rule of Civil Procedure 52, this court makes the following findings of fact and conclusions of law with respect to plaintiff's claims for breach of contract and unjust enrichment.

## A.      Findings of Fact

**The Parties**

1.      The Clay Center is a multi-use museum and cultural facility, located in Charleston, West Virginia, and its construction costs exceeded $60 million.  Joint Stipulations ("J.S.") ¶ 1.  The Clay Center included a climate control system, designed to maintain the heating and cooling requirements of spaces within the facility.  Id.

2.      Dick Corporation ("Dick") was hired as the project general contractor for the construction of the Clay Center (the "Project").  J.S. ¶ 3.  Dick subcontracted various components of the Project to a number of other companies.  J.S. ¶ 4.  Dick subcontracted the mechanical work to Limbach Company ("Limbach"), and the electrical work to Rost Enterprises, L.P. ("Rost").  Id.

3.      Initially, Limbach and Comfort and Process Solutions ("CPS") structured an agreement whereby CPS was subcontracted by Limbach to perform the control system work.  J.S. ¶ 5.  The control system was to regulate properly the heating, air conditioning, and ventilation of the Clay Center.  Joint Exs. 6, 46.  A significant amount of the control system work involved programming.  Trial Transcript of February 4, 2009 (Docket No. 83) ("Feb. 4 Trial Tr.") at 178.

4.      Honeywell was in the business of providing control system products, literature explaining

how to install and use those products, and also programming, software, and technical support.  J.S. ¶ 17.  Honeywell's Indianapolis branch sold control system products to independent contractors; the independent contractors would secure subcontracts to install the products.  The Indianapolis branch provided assistance to independent contractors in securing subcontracts.   In contrast, Honeywell's Pittsburgh branch competed for projects; the Pittsburgh branch would secure subcontracts to install its own products.  Trial Transcript of February 5, 2009 (Docket No. 84) ("Feb. 5 Trial Tr.") at 149-54.

5.      Great American was the surety for Rost and provided certain payment and performance bonds to Limbach for the Project.  J.S. ¶ 30.

**Negotiations Between Limbach, CPS, and Honeywell**

6.      In Limbach's prior experience, Limbach contracted with Honeywell to install its own control system products.  Trial Transcript of February 2, 2009 (Doc. No. 81) ("Feb. 2 Trial Tr.") at 74-75.  Limbach contacted Honeywell's Pittsburgh branch to ascertain whether it was interested in the Project.  Id.  The Pittsburgh branch told Limbach that the Project was not within its territory; Honeywell referred Limbach to CPS.  Id.  Limbach had no prior experience with CPS.  Id.

7.      In the summer of 2000, Limbach had discussions with CPS regarding CPS's bid for the subcontract for the control system work.  J.S. ¶ 8.  Limbach expressed concerns relating to CPS's ability to timely and properly complete the control system work.  Feb. 2 Trial Tr. at 76-78.  On July 13, 2000, Limbach's estimating manager/contract manager, James Claus ("Claus"), sent CPS a letter detailing Limbach's concerns.  J.S. ¶ 22; Feb. 2 Trial Tr. at 83; Joint Ex. 2.  Claus indicated in his July 13, 2000 letter that Limbach's concerns

may be alleviated by drawing support, in the form of a guarantee, from Honeywell.  Feb.

2 Trial Tr. at 83; Joint Ex. 2.  The July 13, 2000 letter sent by Claus to CPS was copied to

Honeywell.  J.S. ¶ 22.  Mark Saunier ("Saunier"), president of CPS, sent to Claus a letter

dated July 17, 2000, regarding the concerns of CPS.  J.S. ¶ 23.

8.   During the course of the negotiations between Limbach and CPS, Honeywell indicated to

Limbach that CPS was an authorized installer of the Honeywell Excel 5000 control

system.  Trial Transcript of February 10, 2009 (Doc. No. 85) ("Feb. 10 Trial Tr.") at 11-

13.  On June 20, 2000, Michael Keller ("Keller"), area market specialist for Honeywell,

wrote to Limbach regarding CPS's qualifications.  In that letter, Keller stated:

> Comfort and Process Solutions (CPS) is an Authorized Honeywell
> Excel 5000 Contractor.  This authorizes CPS to sell, engineer,
> install and service Honeywell's EXCEL 5000 direct digital control
> systems and related HVAC control components for building
> automation.  CPS works directly with Honeywell to provide its
> customers with cost-effective solutions based on Honeywell's
> high-quality HVAC controls and building automation systems.
>
> Honeywell selected CPS after it met several stringent
> requirements.  These include its proven reputation within the
> construction industry, financial resources necessary to undertake
> large projects, and its technical expertise in all facets of building
> control applications, such as engineering, project management,
> commissioning and ongoing maintenance.  Honeywell has chosen
> CPS, in particular, because of their strong presence and quality
> reputation in the new construction and retrofit control industry.
> CPS has trained its staff at Honeywell's Home and Building
> Control University and through the company's professional
> training courses.
>
> Since being authorized to sell Honeywell's Excel direct digital
> control systems CPS has demonstrated a very high level of
> technical expertise.  Their staff includes ex-Honeywell personnel.
> Should CPS ever require support they have full access to
> Honeywell's direct factory technical support.  Honeywell
> warrantees the products to CPS who in turn provides the specified

warrantees to the customer.

*With CPS, you are being served by one of our foremost Excel 5000 Contractors.*

Joint Ex. 1 (emphasis added).

9.  Keller believed that it was in Honeywell's interest that CPS procure a subcontract with Limbach because Honeywell would ultimately benefit from selling the control system products to CPS. J.S. ¶ 20. Keller's compensation was affected by the amount of Honeywell products sold in his territory, which encompassed the Clay Center. J.S. ¶ 21. Keller stated that CPS had not previously completed other projects that rivaled the magnitude or complexity of the Project. Feb. 10 Trial Tr. at 13-14. At the time of the negotiations related to the control system work, CPS had only recently been authorized as a Honeywell contractor; CPS was formed in late 1999. Id. at 10. Keller testified that his representations with respect to CPS were premature:

> Q.      . . . I think on direct you testified – and you correct me if I'm wrong – that [the statement that CPS was one of the foremost Excel 5000 contractors] might have been, quote, a little in advance.
> A.      Yes.
>
> . . . .
>
> Q.      At least in terms of representing that they were one of Honeywell's best contractors, proved contractors, you believed you jumped the gun a little bit there, correct?
> A.      Yeah, but Limbach also had the ability to do their investigation for the contractor, and ultimately they are the ones that decided to subcontract CPS for this project.
> Q.      Okay. But you're the one that made the statement here, right?
> A.      That is correct.
> Q.      Limbach didn't make this statement.
> A.      No.
> Q.      And that statement was premature, wasn't it?

A.      Yeah, I believe it was a little in advance.

Id. at 12-13.

**The August 2000 Letter Agreement**

10.     Despite Honeywell's representations regarding CPS's qualifications to complete the
controls work on the Project, Limbach sought further assurances from Honeywell.  Feb. 2
Trial Tr. at 85-86; Joint Ex. 2.  Specifically, Limbach wanted to enter into a written
agreement with Honeywell that ensured that Honeywell would complete the control
system work if CPS did not.  Feb. 2 Trial Tr. at 85-86; Joint Ex. 2.  Further, Limbach
required that CPS provide payment and performance bonds to Limbach.  Feb. 2 Trial Tr.
at 85-86; Joint Ex. 2.

11.     Honeywell was reluctant to enter into an agreement to perform work on the Project in the
event CPS defaulted.  Honeywell wanted Limbach to agree to compensate Honeywell for
amounts expended in excess of the CPS subcontract amount.  Feb. 2 Trial Tr. at 131-33;
Joint Exs. 3, 4.  Limbach refused to pay excess amounts.  Honeywell requested the right
to pursue the bonding company for the excess costs.  Limbach agreed that Honeywell
could pursue the bonds for excess costs.  Limbach did not represent to Honeywell that
Honeywell could recover on the bonds since Limbach did not know whether the bonds
afforded Honeywell such a right to recovery.  Feb. 2 Trial Tr. at 131-33; Joint Ex. 10.

12.     On August 23, 2000, Claus sent a letter agreement to Keller, which memorialized the
agreement among Limbach, Honeywell, and CPS (the "August 2000 letter agreement").
J.S. ¶ 25; Joint Ex. 10.  The August 2000 letter agreement provided:

> We have issued a Subcontract to Comfort & Process Solutions of
> Lexington, KY.  One of the conditions of this Subcontract is that

Comfort and Process Solutions provide a double obligee bond naming both Limbach and Honeywell on the bond. *This bond will protect both our firms in the event of default*.

By executing this letter, Honeywell hereby agrees to assume the obligations of Comfort & Process Solutions under the Subcontract and to complete the work in a timely manner to meet the project schedule requirements in the event of default by Comfort & Process Solutions on the Subcontract as determined by Limbach. As an obligee under the bond, Honeywell can then pursue the bonding company for its costs beyond those costs covered by the remaining Subcontract balance between Comfort & Process Solutions and Limbach Company.

Limbach will submit all CPS payment applications to Honeywell for review and approval before payment to CPS.

Joint Ex. 10 (emphasis added). The August 2000 letter agreement was executed by Keller, on behalf of Honeywell, and Claus, on behalf of Limbach. Id. Saunier was copied on the August 2000 letter agreement. Id.

13. Mark Shaffer ("Shaffer"), vice president of Limbach, testified that the definition of the term "default," as used within the construction industry, does not encompass physical removal of the defaulting party from the work site:

Q. Did you have an expectation that Limbach would have to remove CPS from the job in order to trigger Honeywell's obligations?
A. No. I mean in the construction industry removing somebody from a job is an extreme remedy that typically you only take after you've gone through a sequence of steps of first declaring them to be in default, giving them a chance to cure the default, trying to work with the contractor. Because really when you remove someone, it's a big shock to the whole project system and it's hard to get someone else back up to speed, particularly on a job like this, that it was on a fairly fast track; and to remove someone and replace them with someone else would take a lot of time to get that whole thing accomplished. So typically you don't remove people, you declare them to be in default and then work with them and try to cure those defaults.

> Q.       Okay.  Are you saying that determination by Limbach of the CPS default and removal are two different things?
> A.       Oh, absolutely.
> Q.       And that's consistent with your long-term experience in the construction industry.
> A.       Yes, it is.

Feb. 2 Trial Tr. at 92-93.  In contrast, Keller testified that default required removal:

> my understanding was that CPS on a default would be removed because it's very tough to come in and have two contractors on a project at the same time.  So one has to, you know, physically be removed so that the other one can come in and do the job.

Feb. 10 Trial Tr. at 42.

14.     According to Keller, this was the first time in his twenty-three years of employment with Honeywell that Honeywell obtained the right to review and approve an approved installer's payment applications on a job.  J.S. ¶ 36.  Honeywell obtained the right to review and approve payment applications in part to monitor CPS's work on the Project and the subcontract balance.  J.S. ¶ 35.  Keller testified: "If CPS was defaulted then we wanted to make sure that there was [sic] funds available to complete the work.  So we did not want to have too much forward payment of their work progress."  Pl.'s Ex. 30, Vol I., at 84-85.  Keller approved CPS's first seven payment applications and CPS's tenth payment application.  Joint Exs. 12-19.

15.     By letter dated August 24, 2000, Keller forwarded the executed August 2000 letter agreement to Limbach and indicated that Honeywell was providing "firm assurance that Honeywell will assume the obligation of [CPS] in the event of default of [its] subcontract."  Joint Ex. 10.

16.     Shaffer understood the August 2000 letter agreement to mean that, in the event of default

by CPS, Honeywell would in essence be assigned CPS's portion of the subcontract, and Honeywell would assume CPS's responsibilities under that subcontract pursuant to the same terms and conditions. Shaffer testified as follows:

> Q. Okay. And what again was your understanding of Honeywell had agreed to do if CPS defaulted?
> A. They would assume all the obligations of CPS under our subcontract.
> Q. And what do you mean by that?
> A. They would step in and finish the job for the – you know, all the requirements, make sure technical requirements were met, and would do it for the amount of the subcontact.
> Q. And by "step in" do you mean take the place of CPS in your subcontract – subcontract with CPS?
> A. Yes, they would take the place of the subcontract.

Feb. 2 Trial Tr. at 87. Furthermore, Limbach specifically included the language "as determined by Limbach" to avoid the situation in which Honeywell would dispute whether CPS was in default. Shaffer testified that the reason this language was added was because:

> you can sometimes get in disputes on bond claims as to whether or not the subcontractor's actually defaulted on its obligations. I've had experience where you called the surety to come in and take over and they'll argue, no, the subcontractor is doing just fine and we're not going to come in.
>
> So we didn't want to get into those kind of arguments. We wanted to be clear if we determined there was [default], that Honeywell would come in and take over.

<u>Id.</u>

17.    Limbach awarded CPS the subcontract to perform control system work by reason of the assurance from Honeywell that Honeywell would perform under the subcontract in place of CPS, in the event of CPS's default. The bonds alone were not enough. Feb. 2 Trial

Tr. at 78. Shaffer stated:

> The other concern here was – particularly with a control system, when we were buying a certain piece of equipment, in this case Honeywell equipment, there are only so many people out there that know how to do that, that would know how to put that system in place and make it operational.
>
> So we were very concerned that Honeywell give us assurances if CPS wasn't able to do it, they would step in and finish the project.

Id. The promise made by Honeywell to perform under the subcontract in the place of CPS contained the necessary assurances to induce Limbach to award control system work to CPS:

> Q.     Did [the August 2000 letter agreement] contain the assurances from Honeywell that were required for Limbach to issue a subcontract to CPS?
> A.     Yes. With this letter, they specifically agreed to assume the obligations under the subcontract in the event of a default as determined by Limbach.

Id. at 91.

**The March 2001 Letter Agreement**

18.    After the August 2000 letter agreement was executed, the parties learned that CPS was unable to obtain a surety bond for the control system work. J.S. ¶ 27; Trial Transcript of February 3, 2009 (Docket No. 82) ("Feb. 3 Trial Tr.") at 175-76. The parties, therefore, sought to restructure their previous agreement so that CPS would still be subcontracted to perform the control system work. J.S. ¶ 27. Limbach, Rost, and CPS agreed that Limbach would issue the control system subcontract to Rost. Id. Rost would obtain the performance bond, and then subcontract the control system work to CPS. Id. According to the Rost-CPS subcontract, the completion date for CPS's work was set for November

12, 2002.  Joint Ex. 22.

19.     On March 23, 2001, the parties entered into a letter agreement that memorialized the new

agreement among the parties (the "March 2001 letter agreement").  J.S. ¶ 28; Joint Ex.

11.  The March 2001 letter agreement, which was directed by Shaffer to Keller, provided:

> Referring to the letter dated August 2 [sic], 2000 that was executed
> by you on behalf of Honeywell (copy enclosed), Comfort &
> Process Solutions, in conjunction with Rost Enterprises (the
> electric contractor selected by Comfort & Process Solutions), has
> requested that we restructure the agreement.  Specifically, they
> would like us to issue our subcontract to Rost Enterprises for the
> control system.  Rost Enterprises, in turn, will issue the double
> obligee bond, required in our agreement, which will name both
> Limbach and Honeywell as oblige[e]s.
>
> All other terms of our August 23, 2000 agreement will remain in
> effect.  If Honeywell agrees with this revised amendment, please
> have the enclosed copy of this letter executed by an authorized
> representative of Honeywell . . . .

Joint Ex. 11.  Saunier from CPS, William Rost ("Mr. Rost") from Rost, and Jack Kumper

from Limbach were copied on the March 2001 letter agreement.  Id.  Keller executed the

March 2001 letter agreement on behalf of Honeywell and Shaffer executed the agreement

on behalf of Limbach.  Id.  By letter dated March 27, 2001, Keller again stated that

Honeywell was providing "firm assurance that Honeywell will assume the obligation of

[CPS] in conjunction with [Rost]."  Joint Ex. 11.

20.     Shaffer testified that the March 23 letter agreement did not change the provision of the

August 20 letter agreement which required Honeywell to take over CPS's obligations in

the event Limbach determined CPS to be in default:

> Q.     Okay.  Was there any change to that [requirement] based
> on this letter agreement?
> A.     No, the only change was the substitute or the flip flop of

Rost and CPS and to make sure that Honeywell was comfortable with that arrangement.

Feb. 2 Trial Tr. at 105.

21. Great American issued subcontract performance and payment bonds (the "bonds") dated August 10, 2000. The bonds named Rost as the principal and Limbach as the obligee. J.S. ¶ 30; Joint Ex. 8. By way of dual obligee rider, Honeywell was named as an additional obligee on the bonds. J.S. ¶ 30; Joint Ex. 8. Great American did not know about the August 2000 and March 2001 letter agreements (collectively referred to as the "Letter Agreements") until late 2003 or early 2004. Feb. 5 Trial Tr. at 15-16. Great American was not a party to the Letter Agreements and was not involved in negotiating those agreements. Id.

22. Performance bonds are to compensate a party owed performance under a construction contract. The performance bond protected Limbach, the party owed performance under the March 2001 letter agreement; Honeywell, being obligated to fulfill the contractual responsibilities of CPS in the event of default, would not be able to recover under the performance bond. Feb. 5 Trial Tr. at 8-12; Joint Ex. 8. On the other hand, payment bonds are to compensate a party for its performance, in the event the party it owes performance to does not pay. If Honeywell had performed under the subcontract, its recovery under the payment bond might be limited to the remaining balance on the subcontract amount. Feb. 5 Trial Tr. at 8-12; Joint Ex. 9.

**CPS's Performance of the Control System Work**

23. During the course of the Project, CPS purchased control system products from Honeywell. J.S. ¶ 32. The purchased products cost CPS approximately $150,000. J.S. ¶

12

18; Feb. 10 Trial Tr. at 11. The amount of the Limbach-Rost subcontract was $668,281. J.S. ¶ 12. Rost in turn subcontracted the control system work to CPS; the value of CPS's portion was $444,705. J.S. ¶ 14.

24.  Honeywell's building control specialist, Steven Amato ("Amato"), provided on-site training and assistance to CPS, and was designated by Honeywell to investigate the status of CPS's progress on the Project. Feb. 10 Trial Tr. at 80-81, 84-86. Limbach believed Amato was at the construction site in order to advise CPS and to approve payments from Limbach to CPS. Feb. 3 Trial Tr. at 60-61.

25.  By reason of turnover at CPS, Amato had to train several individuals. In the course of training CPS employees, Amato performed some of the programming work for CPS for the control system. Amato indicated that he completed approximately fifty percent of the programming related to the control system. Feb. 10 Trial Tr. at 102-07.

26.  On November 6, 2002, Daniel Homan ("Homan"), a project manager for Limbach, sent an email to Keller stating "I think it is anxiety time," and that "I do not think CPS has the horsepower to get the job done." Feb. 2 Trial Tr. at 172; Joint Ex. 20. Homan asked Keller when Honeywell could send workers to complete the control system work. Joint Ex. 20. On November 14, 2002, Homan sent a letter to Keller explaining problems with CPS's performance on the Project. The letter stated:

> I have been trying to get CPS to man the Clay Center Project for quite a while with no success.
>
> I started writing letters in Early October to try and drive home the seriousness of the situation, and all I have received in return are broken promises. I have been told for four weeks now that more people will be on the job but still only one man is here.

> Now the owner/Architect has requested a schedule, manpower projections, and a detailed daily outline for the completion of the control system.
>
> I have faxed this request to Mark Saunier/CPS, and will advise him that I need this information and his plan of action to complete the project no later than November 15th 12:00 noon EST.
>
> If I have not receive [sic] this information with the appropriate amount of skilled people on the Job by Monday November 18, 2002 I will have no choice but to default CPS. Then it will be Honeywell's obligation to finish this project per the signed agreement between Limbach Company and Honeywell Inc. dated August 23, 2000.

Pl.'s Ex. 4.

27.     In February 2003, Limbach sent Rost letters indicating that the control system work was behind schedule. Joint Exs. 21-26. In a letter dated February 13, 2003, a Limbach project manager, Greg Nastal ("Nastal"), advised Rost that:

> [Limbach] has provided the notification required for default on Subcontract Number 4009-01. We are proceeding to complete the controls scope of work, identified in the Subcontract referenced above, by any means necessary. The costs associated with the completion of this work will be back charged to [Rost].

Joint Ex. 21.[1] On February 20, 2003, Nastal advised Rost that "[a]s of 7:30 am this morning there are no employees of CPS on site. Honeywell should be notified of the nonperformance of your subcontractor and appropriate steps take to remove them from site and replace them with Honeywell employees. Please provide Limbach a response of your conversation with Honeywell." Joint Ex. 25. On February 21, 2003, Nastal wrote Rost another letter notifying Rost that there had been no "remedy of the problem

---

[1] There is no evidence of record with respect to the content of Subcontract Number 4009-01. The court has not been provided with a copy of the document and the parties have made only passing references to the document. Based upon the context of certain references to Subcontract Number 4009-01, the court assumes that this document

addressed in [the] letter of February 13, 2003." Joint Ex. 26. Nastal informed Rost that

the February 21, 2003 letter served as "notification of breach of contract." <u>Id.</u>

28. In February 2003, Limbach determined that CPS was in default. Walter Daniels

("Daniels"), Limbach's operations manager, testified:

> Q. Let's talk a little about the background of this letter. At this time you were supervising Mr. Nastal who is the project manager, correct?
> A. Yes.
> Q. And did Mr. Nastal keep you informed regarding the status of the project and particularly the controls?
> A. He did.
> Q. Okay. And as of this time, in February of – 13th of 2003, had you participated in discussing the controls with Mr. Nastal and the status?
> A. I did.
> Q. Okay. And had you talked with Mr. Nastal about whether CPS was able to complete those controls?
> A. I did.
> Q. Did you discuss with Mr. Nastal that CPS had not yet completed the controls?
> A. I did.
> Q. And did you discuss delays that CPS –
> A. Yes.
> Q. – had encountered? And did Limbach determine as of this time that there was a default based on the fact that the controls system was not completed?
>
> . . . .
>
> A. Yes.

Feb. 2 Trial Tr. at 180-83.

29. By letter dated February 26, 2003, Rost informed Keller that CPS had failed to complete

properly and timely the control system work as determined by both Limbach and Rost;

attached were Nastal's February 13, 2003 and February 21, 2003 letters. Joint Ex. 29;

---

embodies the agreement between Rost and CPS relating to the control system.

J.S. ¶ 40.  In Rost's February 26, 2003 letter, Rost advised Keller that CPS had not

remedied problems identified in prior notifications directed to CPS.  Specifically, Rost

stated:

> The inability of [CPS] to respond in a timely manner to meet the
> project schedule requirements has forced [Rost] into a position
> where we must claim breach of contract on the part of [CPS].
> [Rost] hereby notifies [Honeywell] that in accordance with the
> executed Limbach agreement letters dated August 23, 2000 and,
> March 23, 2001, [Honeywell] is to immediately assume the
> obligations of [CPS] under the Subcontract and complete the work
> in a timely manner to meet the project schedule requirements.

Joint Ex. 29.  Rost did not retract the letter providing notice of the determination that CPS

was in default.  Feb. 4 Trial Tr. at 13.

30.     In fulfilling his duty to report on the progress of the Project, Amato prepared a summary

memorandum on March 27, 2003.  J.S. ¶ 33; Joint Ex. 30.  In the summary memorandum,

Amato indicated that he was "pleased to see that the control system is closed [sic] to

completion."  Joint Ex. 30.  Amato further indicated that the control system was coming

together well.  Id.  On April 4, 2003, Amato drafted an update to the March 27, 2003

memorandum.  Joint Ex. 31.  Amato again stated: "[t]he controls are progressing well."

Id.  Despite the progress, Amato testified that issues were still present in late March:

> Q.      In your e-mail did you note that there were some open
> issues and some concerns that you had even based on that two hour
> visit?
> A.      Yes.   There were a few things that were off and – for
> instance, the smoke evacuation system.  We didn't do anything
> with that.  That was – they told me they were going to change that
> whole sequence and ignore it.  So I said, okay, we're not doing
> anything with that – I think I made a note of it here.
>         The E-buss was the wrong wiring, and I told them that right
> from the beginning.  First day there I saw the wires are wrong.
> And he – and they had a battle with Rost, because they were the

electrician, to put the right wire there.

And you could see here it still says that the fan coil units are on that buss, the VAV boxes were on that buss, so that was the – actually there were four busses, three busses that were E-busses, and they had – had an issue with that.

Q.     And did you understand that the – at that time the E-buss then – it drove related to the wiring used, the fan coil units, you know; so until that E-buss issue was resolved, those – that equipment and devices on that equipment were affected, is that correct?

A.     That's correct. The air handlers would work, but the air wouldn't get into – unless those boxes were open, the air wouldn't get into the thing.  Now, the E-buss doesn't have to talk for the units to work. But if you want to see what's going on, or you want to operate properly and balance it and all the things that has to be done, they have to be able to communicate on that buss.

Feb. 10 Trial Tr. at 87-88.

31.     Despite Keller's testimony that he did not consider CPS to have defaulted at the time it received notice from Limbach and Rost about Limbach's determination, there is no evidence in the record that Honeywell communicated its understanding to Limbach; Mr. Rost testified that no one from Honeywell told him that CPS had to be physically removed in order to trigger Honeywell's duties under the Letter Agreements.  Feb. 4 Trial Tr. at 14.

32.     Dick became concerned about the quality and status of the control system work.  Joint Ex. 32.  On April 24, 2003, Todd Anderson ("Anderson"), MEP coordinator for Dick, wrote a letter to Daniels to express concerns.  Id.  Anderson's letter indicated that, although CPS had previously reported that the majority of the system was completed and operational, a subsequent inspector found that there were problems with the system.  Id.  Anderson also indicated that Amato's reports regarding the control system work were brief and contained some inaccuracies.  Id.  Anderson requested that Limbach address the

17

problems with the control system work.  Id.  Anderson's letter indicated that the Clay Center requested "qualified representatives from Honeywell visit the project, verify the sequence of operations, walk through the point-to-point functional performance of each system with CPS and provide a comprehensive report on all systems."  Id.

33.    Rost sent a letter to CPS dated June 9, 2003, and attached a June 5, 2003 letter from the Clay Center.  Joint Ex. 35.  Rost stated: "[t]he Clay Center letter serves as notification of default for the items listed . . . ."  Id.  Among the items included in the referenced list is "Building Management Control Systems."  Id.

34.    On June 30, 2003, Amato again reported to Honeywell regarding the status of the Project. J.S. ¶ 34; Pl.'s Ex. 8.  Amato sent an email to Keller discussing the problems that Dick and its subcontractors were having:

> It seems Dick Corp and their subs were thrown off the Clay Center job last Wednesday and [the company hired by the Clay Center to undertake performance testing] has asked Summit to work on the controls.  I spoke to Mike Geiger [of Honeywell's Pittsburgh branch], who told me Dick is not leaving the job.  By the time the owner goes to court Dick expects to be finished.  *Honeywell branch has 5 people working on the job still, as well as CPSs [sic] crew.  It's real close to finishing.*  mostly [sic] small items and the Ebus problem.  I think the target is the 12th.
>
> Drew [Logan of CPS] told me that the Mike Geiger's menu to Dick said that the software was about 50% done.  He quotes me.  I told them that I did about 50% of the software a year ago.  *It should be about 80% done.*  Drew feels that is an issue since Limbach is using that against CPS.  Mike said he would reissue a statement when all the software is finished (and the job) with more accurate numbers.

Pl.'s Ex. 8 (emphasis added).

35.    On July 1, 2003 Daniels sent Keller a letter addressing problems with CPS and

demanding that Honeywell take action.  Pl.'s Ex. 9.  The letter provided:

> CPS failed to complete and deliver the controls portion of the referenced project.  We are now several months late delivering a schedule with severe damage penalties, and still counting.  Dick Corporation hired Automated Control Solutions from Pittsburgh at $130.00/straight time plus expense to correct and complete the controls.   The delay and labor cost of these problems are significant, not to mention potential collateral damages.  Limbach selected CPS for this project based on your guarantee that Honeywell would provide the support necessary to insure the controls installation success, letters attached.  The project is not a success, CPS did not meet the contract requirements and our many requests to you for support fell on deaf ears.  Honeywell didn't stand behind the 3/23/2001 agreement signed by you and Mark Shaffer.   Because Honeywell did not live up to the agreement Limbach will seek to recover from Honeywell all cost incurred through the CPS failure, including but not limited to back charges for Honeywell Technicians, schedule impacts, delay direct cost, and related consequential cost.

Id.  Honeywell did not respond to demands made on it by Limbach or Rost to complete CPS's subcontract.  Feb. 4 Trial Tr. at 14; Pl.'s Ex. 4.  Keller was aware of letters from Limbach and Rost relating to problems with the control system.  Pl.'s Ex. 30, Keller Dep., Vol. II at 45-52.

36.  By way of letter dated July 22, 2003, Emil Pohodich ("Pohodich"), on behalf of Rost, notified Keller that CPS had defaulted on its subcontract and was removed[2] from the Project.  Pl.'s Ex. 13.  Pohodich further notified Keller that Rost intended to complete the work required under its subcontract with Limbach and requested Honeywell assume CPS's obligations in accordance with the August 2000 Letter Agreement.  Finally, Pohodich informed Keller that CPS had defaulted and was removed from the site.  The letter again requested that Honeywell assume and complete the obligations of CPS.  Id.

---

[2] CPS was not removed by Limbach or Rost.  CPS was removed by the West Virginia Department of Labor, because

37.     By letter dated September 25, 2003, Rost informed Honeywell that it had received

        another notice from Limbach relating to CPS's deficient performance on the Project.

        Joint Ex. 40.  The letter indicated that there was "a long line of letters from Limbach and

        Rost to [Honeywell] requesting that Honeywell step in and solve the problems created by

        CPS on this project."  Id.

**Honeywell Enters into Subcontract to Complete Controls Work**

38.     In April 2003, Dick contacted Honeywell's Pittsburgh office and hired technicians to

        perform an assessment of the control system work at the Project.  J.S. ¶ 42.  Honeywell

        assigned two technicians to perform the assessment.  J.S. ¶ 43.

39.     Honeywell and Dick entered into a subcontract agreement whereby Honeywell agreed to

        assess and complete the control system work (the "Remedial Subcontract").  J.S. ¶ 44;

        Joint Ex. 33.  The Remedial Subcontract was dated May 19, 2003, but was not executed

        by Honeywell until August 4, 2003 and was not executed by Dick until August 14, 2003.

        Joint Ex. 33.  The Remedial Subcontract provided that it was "not to supersede any

        contract, purchase order and/or understanding by or between Honeywell, and [CPS],

        [Rost] and/or Limbach."  Id.  The Remedial Subcontract provides that it "shall be

        governed by the Laws of the State in which the project is located."  Id.  Honeywell did

        not report to Limbach or Rost during its performance under the Remedial Subcontract

        with Dick.  Feb. 4 Trial Tr. at 22-23, 32; Pl.'s Ex. 16.  The Remedial Subcontract

        provided that Honeywell would perform the controls work for "$130 per hour, plus

        applicable itemized expenses."  Joint Ex. 33.  Keller testified that the $130 per hour rate

        likely included a profit component:

---

CPS did not have the necessary license.  See Def.'s Exs. DO, DP.

Q.     Were you also familiar with whether or not the Honeywell branches and the authorized contractors included a profit in their rates?
A.     For sure.   They're all for-profit businesses and would include a profit.

Feb. 10 Trial Tr. at 4; see also Pl.'s Ex. 30, Keller Dep., Vol. I at 63-66.

40.     Keller testified that when Honeywell performed under the Remedial Subcontract, CPS was still performing work at the project site:

THE COURT: Okay.  Now, was Honeywell on site doing work and correction work at the same time CPS was there?
THE WITNESS: Yes.
THE COURT: Okay.  So they were working even though CPS hadn't been removed.
THE WITNESS: They were giving some – doing some work from Dick.  Dick had directed them initially.  As I understand it, Dick came in and asked them to go in and do a synopsis of what the situation was, and that's when they were doing work at the same time on the project.

Feb. 4 Trial Tr. at 71.

41.     Pursuant to the Remedial Subcontract, Honeywell submitted invoices to Dick for work on the Project.  J.S. ¶ 46.  Honeywell invoiced Dick for a total of $388,755.84.  Joint Ex. 47. Dick paid Honeywell in full for the work Honeywell performed pursuant to the Remedial Subcontract between Dick and Honeywell.  J.S. ¶ 47.

42.     Rost knew that Dick had hired Honeywell to complete the control system work after CPS was removed from the Project, but Rost did not approve the Remedial Subcontract.  Feb. 4 Trial Tr. at 21-24.  Rost received copies of Honeywell's invoices, which were submitted to Dick for payment.  Id. at 24.  Limbach and Rost objected to the invoices, and Dick temporarily suspended payments to Honeywell after Dick was made aware of the Letter Agreements; Honeywell, however, threatened to walk off the Project, and Dick

resumed payments.  Id. at 19-21, 25-26, 28-29.  After Dick paid Honeywell, Dick back

charged Limbach for the costs, plus a twenty percent markup, for a total of $466,507.

J.S. ¶ 48.  Limbach back charged Rost for the amounts demanded by Dick.  J.S. ¶ 49.

43.   The term "costs," as used in the construction industry, refers to expenses for materials

and labor.  The term does not include a profit component.  Larry Dunn ("Dunn"), an

engineering expert called by plaintiff who specializes in the installation of HVAC control

systems, was questioned by plaintiff's counsel about the term and testified as follows:

> Q.      Okay.  Mr. Dunn, I'd like to turn now to the issue of costs
> and likely costs of this work. And, Mr. Dunn, in your vast
> experience in the HVAC and building controls industry, does the
> term, quote, costs of a building controls contractor have a
> commonly understood meaning?
> A.      Yes.
> Q.      And what is that meaning?
> A.      That meaning is generally that cost is the cost of what you
> would incur on a project, direct cost for performing the work, field
> labor, materials incorporated into the project, rentals for large
> equipment in a subcontractor's.
> Q.      Okay.  And with respect to – so with respect to let's say a
> controls – temperature and controls contractor's costs, what would
> that include?
> A.      For a temperature control contractor that would generally
> include the cost of field labor performed and the cost of materials
> they provided to the project.
> Q.      Okay.  And is costs in the industry commonly understood
> to include a profit component?
> A.      No, that's a separate item.
> Q.      Okay.  And –
> THE COURT: Well, while we're on that, can I ask you is overhead
> included?
> THE WITNESS: Say again.
> THE COURT: Is overhead included in the costs?
> THE WITNESS: Overhead is usually stipulated as a certain
> amount but included as part of the cost item.  It's often a fixed
> percentage.
> BY MR. BENTZ:
> Q.      And is it common in the industry for parties in contracts to

differentiate between profit and costs?

A.    It is.

Q.    Can you give the Court some examples of that.

A.    Well, on public works projects it's very typical that again the costs are very specifically defined and often substantiated by certified payroll documents. Also the markups for those costs to compensate for overhead is often stipulated as a percentage, often a percentage not to include, sometimes the percentage is ten percent. Profit then is a separate item. Often again it's stipulated as a percentage. Public works projects, it's often five percent.

Q.    And within these contracts is it very common that profit and costs are defined as different things?

A.    They are.

Q.    And, in fact, oftentimes is – what you're saying is that oftentimes the allowed profit is as a percentage of the costs?

A.    It is.

Feb. 4 Trial Tr. at 194-95.

44.    Dunn had extensive knowledge of the costs of control system work, based upon his experience:

Q.    Mr. Dunn, in the 25 years or so of experience you've had with control systems, did you become familiar with the types and amounts of work required to install a building's control system?

A.    Yes, I did.

Q.    And how was that generally – how was that knowledge obtained?

A.    Well, it was – it's generally obtained with estimating projects for a number of years and developing – estimating systems. Obviously when we did our – started up our own control division in – with – in-house in – the mechanical contractor I worked for, we developed our own specific estimating system to estimate those costs, but I've got a lot of historical information on numerous kind of facilities and what control costs are.

Q.    Okay. And I take it you have had occasion to estimate the likely costs of particular control system jobs over the years?

A.    Yes, I have.

Q.    Would that be with respect to many, many jobs?

A.    That would be many, many jobs.

Q.    And have you had occasion to do that for owners or owner's representatives?

A.    Yes, I have.

Q. Have you done that for mechanical contractors, perhaps contemplating entering into a subcontract with the temperature and controls subcontractor?

A. Yes, I have.

Q. Have you done that for temperature controls contractors, you know, bidding or considering bidding on a controls job?

A. I've really not done it for other temperature control contractors except as a price check; and we would do this – I would do this on my design build projects, where I would estimate the cost of the control system, and then I might negotiate with the temperature control subcontractor; or I might estimate systems and as an owner's representative negotiate – help them negotiate their projects. But I have not estimated on behalf of any independent temperature control contractor.

Q. Okay. And did you tell us before that some or at least one of the jobs you held, that entity that you worked for actually did its own temperature and controls work for a time?

A. Yes, we did.

Q. Okay. And did you involve estimating for that division of that company?

A. Yes, I did.

Feb. 4 Trial Tr. at 165-66.

45. Dunn had previously negotiated labor rates on control system projects:

Q. Now, Mr. Dunn, in this case on behalf of Great American I've asked you to look specifically at labor rates and costs for controls work, and have you previously had an occasion to estimate the likely labor costs for a complex controls job?

A. Yes, I have.

Q. Okay. Many times?

A. Many times.

Q. Have you had occasion to negotiate labor rates to be charged on a complex controls job?

A. Yes, I have.

Q. And again with what frequency?

A. Hundreds of times.

Q. And have you done that negotiation on both the owner's side of the table and on the controls contractor's side of the table?

A. I've done it on the owner's side of the table and generally the mechanical contractor's side of the table. I've done it on the controls side of the table when I was representing our own in-house controls division. I've also done it for construction

managers.  So owners, construction managers, mechanical contractor.

Q.    Okay.  And approximately how many years have you been involved in those sorts of negotiations over labor rates for controls work?

A.    Again, for over 25 years.

Feb. 4 Trial Tr. at 167-68.

46.    Dunn testified that the work performed by Honeywell on the Project was consistent with the work CPS was required to perform under the subcontract:

Q.    Okay.  And again at my request did you review Honeywell's description of the work it performed at the Clay Center with an eye toward whether the described work was part of the scope of the work that CPS was required to do on the Clay Center project?

A.    I did.

Q.    Okay.  And what, if any, conclusion did you draw based first upon your review of the specifications for the job and the contracts and secondly your review of all of Honeywell Pittsburgh's billing records?

A.    I concluded that Honeywell Pittsburgh did not do any significant work that was outside the requirements of the CPS contract.

Q.    Okay.  And so do you have a professional opinion as to whether the work done and billed by Honeywell Pittsburgh was within the controls contract required under the original controls – required of the original controls contractor, CPS?

A.    Yes, it was.

Q.    And that's your professional opinion?

A.    It is.

Feb. 4 Trial Tr. at 191-92.

47.    Dunn estimated the expenses for labor and overhead that Honeywell spent on the contract, and determined it to be $73.36 per hour.  Dunn likewise estimated that Honeywell collected $56.64 in profit per hour.  Feb 4 Trial Tr. at 197-203.  Dunn concluded that, based upon the 2520 hours that Honeywell worked on the Project,

Honeywell earned a profit of $142,733.  <u>Id.</u> at 203.

**The Claims**

48.    Dick, Limbach, Rost, Great American, and CPS (the "litigating parties") asserted claims

against each other relating to issues that arose during the completion of the Project.  J.S. ¶

50.  In May 2004, Great American and Rost settled all claims with Dick, Limbach, and

CPS.  J.S. ¶ 52.  The litigating parties excluded from the settlement agreement any claims

that they might have had against Honeywell.  <u>Id.</u>  Great American received settlement

releases from each of the litigating parties and the litigating parties assigned to Great

American any claims that the parties may have had against Honeywell.  J.S. ¶ 53.  On

August 9, 2004, Great American demanded Honeywell pay $450,000 by August 30, 2004

as full and final settlement of the matter.  Pl.'s Ex. 27.  The demand stated:

> If payment of $450,000 is not received by August 30, 2004, as set
> forth above, Great American has no choice but to take such action
> as is necessary to protect its interests, which may include the
> institution of a lawsuit against Honeywell for all damages incurred
> together with punitive damages, attorney's fees and costs. I trust
> this will not be necessary.

<u>Id.</u>

49.    On June 22, 2005, Great American filed the instant lawsuit asserting claims against

Honeywell for breach of contract, unjust enrichment, breach of express warranty, breach

of the implied warranty of merchantability and breach of the implied warranty of fitness

for a particular purpose.  (Compl. (Doc. No. 1.).)  Additionally, Great American withheld

$11,762.18 from Honeywell on another unrelated project.  J.S. ¶ 56.  Great American's

sole reason to withhold the funds was as a set-off against the claims asserted in this case.

<u>Id.</u>  On January 26, 2007, Honeywell filed a motion for summary judgment with respect

to all Great American's claims.  (Docket No. 40.)  On September 28, 2007, the court issued a memorandum opinion granting Honeywell's motion with respect to the breach of warranty claims, and denying the motion with respect to the claims of breach of contract and unjust enrichment.  (Docket No. 51.)

**B. Conclusions of Law**

**1. Breach of Contract**

1. The parties stipulated that the substantive law of West Virginia is applicable in this case. J.S. ¶ 55.

2. In order to succeed on a claim for breach of contract, Great American must establish: (1) the existence of a contract between Honeywell and it, including the essential terms of that contract; (2) a breach of a duty imposed by the contract on the part of Honeywell; and (3) damages resulting from that breach.  See Bd. of Educ., Mongalia County, W. Va. v. Mellon-Stuart Co., No. 88-1768, 1989 WL 106813, at *3 (4th Cir. Sept. 8, 1989) (applying West Virginia law).  Great American, as the assignee of Dick, Limbach, and Rost, argues that Honeywell breached the terms of the Letter Agreements when it failed to assume the contractual obligations of CPS, after Limbach determined CPS was in default.

3. Under West Virginia law, "[t]he fundamentals of a 'legal contract' are competent parties, legal subject-matter, valuable consideration, and mutual assent.  There can be no contract, if there is one of these essential elements upon which the minds of the parties are not in agreement."  Wellington Power Corp. v. CNA Sur. Corp., 614 S.E.2d 680, 684 (W. Va.

2005) (quoting <u>Virginian Exp. Coal Co. v. Rowland Land Co.</u>, 131 S.E. 253 (W. Va. 1926).  The parties do not dispute the existence of a contract, but rather dispute the terms of the contract and whether Honeywell breached any duties imposed by the terms of the contract.

### a. Existence of a Contract

### i. Essential Terms of the Contract

4.     In this situation, Honeywell argues that the phrase "Honeywell hereby agrees to assume the obligations of [CPS]," as well as the terms "default" and "costs," are ambiguous. Because of the ambiguity, Honeywell argues that the phrase and terms should be construed against the drafter of the agreement, which is Limbach.  Construing the phrase and terms against Limbach would effectively construe them against Great American, the assignee of Limbach.

5.     Questions about the plain meaning of contract terms are questions of law.  <u>Fraternal Order of Police, Lodge No. 69 v. City of Fairmont</u>, 468 S.E.2d 712, 716 (W. Va. 1996). "[C]ontracts containing unambiguous language must be construed according to their plain and natural meaning."  <u>Id.</u>  "It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them."  <u>Bennet v. Dove</u>, 277 S.E.2d 617 (W. Va. 1981) (quoting <u>Cotiga Dev. Co. v. United Fuel Gas Co.</u>, 147 W. Va. 484, 128 S.E.2d 626 (1962)).

6.     "Contract language usually is considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of

opinion as to the meaning of words employed and obligations undertaken." City of Fairmont, 468 S.E.2d at 716. Disagreement between the parties as to the construction of a contract, however, does not necessarily mean that the contract is ambiguous. Flanagan v. Stalnaker, 607 S.E.2d 765, 769 (W. Va. 2004) (citing Supervalue Operations v. Ctr. Design, 524 S.E.2d 666 (W. Va. 1999)).

7.      Honeywell makes conclusory statements that the phrase and terms are ambiguous and offers interpretations it believes should be given to the language, but offers no explanation why the language is ambiguous.

8.      Honeywell argues the term "costs" should mean all costs for materials and labor, including overhead and profit, to complete the remaining control system work that was assigned to CPS. Honeywell argues the term "default" should mean termination for default and removal of CPS from the Project site. Honeywell argues the phrase "Honeywell hereby agrees to assume the obligations of [CPS]" in the Letter Agreements should mean that Honeywell or its designee will complete the control system work assigned to CPS, and that Honeywell or its designee will be permitted to contract with Rost, Limbach, Dick, or Clay Center to complete the work.

9.      The court finds the term "costs," as it pertains to the Letter Agreements, is ambiguous. The proffered interpretation of each party is reasonable; "costs" is "an inherently flexible term." Batzer Constr., Inc. v. Boyer, 129 P.3d 773, 779 (Or. Ct. App. 2006). The relevant context of the use of the term is as follows:

> By executing this letter, Honeywell hereby agrees to assume the obligations of Comfort & Process Solutions under the Subcontract and to complete the work in a timely manner to meet the project schedule requirements in the event of default by Comfort &

> Process Solutions on the Subcontract as determined by Limbach. As an obligee under the bond, Honeywell can then pursue the bonding company for its costs beyond those costs covered by the remaining Subcontract balance between Comfort & Process Solutions and Limbach Company.

Joint Ex. 10.  The Letter Agreements do not detail the various components of "costs" and make no mention of overhead or profits.

10.  According to Black's Law Dictionary, the term "default" is defined as "[t]he omission or failure to perform a legal or contractual duty."  BLACK'S LAW DICTIONARY 449 (8th Ed. 2004).  The court finds no merit to defendant's assertion that "default" is ambiguous, as it can only conceivably be interpreted in one reasonable manner.  The condition precedent here when viewed in light of the surrounding text reads, "in the event of default by [CPS] on the Subcontract as determined by Limbach."   Substituting the familiar definition, this language reads: "in the event of [omission or failure to perform a duty under the subcontract by CPS] as determined by Limbach."

11.  Honeywell argues "default" should mean both termination for default and removal of CPS from the Project site.  Although Honeywell frames its argument as an interpretation of the supposedly ambiguous term "default," Honeywell is in essence requesting the court add words that are not there.  Nowhere in the Letter Agreements is there language with respect to the physical removal of CPS from the Project site.  A request to add such language disregards the plain meaning of the contract.

12.  Honeywell also argues the phrase "Honeywell hereby agrees to assume the obligations of [CPS]" is ambiguous, and wishes to interpret it as authorizing Honeywell to enter a new contract to complete CPS's work with Rost, Limbach, Dick, or Clay Center.  Honeywell

reads the phrase in isolation, ignoring the surrounding language. The sentence reads in its entirety: "By executing this letter, Honeywell hereby agrees to assume the obligations of [CPS] under the Subcontract and to complete the work in a timely manner to meet the project schedule requirements in the event of default by [CPS] on the Subcontract as determined by Limbach." Honeywell disregards the key words "under the Subcontract." The plain meaning presumes that Honeywell will perform, in accordance with the CPS-Rost subcontract, those duties binding on CPS under the subcontract. This plain meaning does not afford Honeywell the right to renegotiate or enter a new contract with any party.

13. For the reasons stated, the term "default" is clear and unambiguous. Even if, as matter of law, the court found there was no plain meaning and considered the term ambiguous, the court finds that the parties did not intend that the Letter Agreements be interpreted as Honeywell contends. If an ambiguity exists, extrinsic evidence of the parties' intent is submitted to the trier of fact; the trier of fact determines the meaning the parties' assigned to the uncertain contract provisions. City of Fairmont, 468 S.E.2d at 715.

14. Extrinsic evidence that may be considered in interpreting ambiguous language includes usage of trade, the circumstances surrounding the agreement, and any conduct of the parties which reflects their understanding of the contract's meaning. 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 30:5 (4th ed. 2007), 12 id. § 34:1; see Energy Dev. Corp. v. Moss, 591 S.E.2d 135, 140 (W. Va. 2002) (industry practice). The court recognizes that the Letter Agreements were drafted by Limbach and should be construed against Limbach, but the court will not read into the language of the contract words or phrases that are not there. Additionally, the rationale

for construing contractual language against the drafter has less force when the non-drafting party is sophisticated. <u>See</u> 11 WILLISTON & LORD § 32.12.

15.     With respect to the term "default," Shaffer's testimony establishes that the term, as used within the construction industry, does not include a requirement of removal of the party in default from the site. Furthermore, the conduct of the parties sheds light on their intent with respect to the term. Keller testified that Honeywell performed control system work on the Project while CPS was also performing work. Additionally, at no point during the Project did Honeywell express denial or objection to Limbach's determination that CPS was in default. At trial, Keller testified that he thought "default," as that term is used in the Letter Agreements, required the removal of CPS. The court does not find this testimony credible; Keller's interpretation of the Letter Agreements is contrary to the ordinary usage of the term that arises in practice, Honeywell commenced control system work even though CPS was not removed, and neither Keller nor any other Honeywell employee disputed or objected to Limbach's determination of CPS's default within a reasonable amount of time.

16.     As already explained, the term "costs" is ambiguous. The court finds that the parties intended that the term, as used in the Letter Agreements, be interpreted as exclusive of profit. Dunn's testimony explained that, within the relevant industry, the term "costs" includes expenses for labor, materials, and overhead, but that it does not include profit. The court credits this testimony; Dunn's credentials are impressive and his experience in the industry is substantial. Honeywell's interpretation is contrary to the usage of the term in the industry. The court accordingly finds that, under the Letter Agreements,

Honeywell was entitled to recover the expenses associated with the control system work, but not receive a profit for that work.[3] The question remains what is the effect of the language in the Letter Agreements that Honeywell is protected by the bonds for its costs in excess of the subcontract amount.

### ii. Mistake

17.    Although not directly raised in its proposed findings of fact and conclusions of law, upon moving for summary judgment Honeywell argued that the Letter Agreements are void because the parties were mutually mistaken about a key contract term. In particular, Honeywell argued that both Limbach and Honeywell believed that the Letter Agreements provided bond protection for Honeywell in the event that CPS defaulted under the subcontract. Honeywell characterized the mistake as one of law, not fact. In ruling upon the motion, however, the court determined that Honeywell's alleged mutual mistake might be deemed a mistake of fact under West Virginia law:

> [I]t is generally recognized that a mistake as to the legal effect of a contract, though a mistake of law, will be treated as a mistake of material fact where the mistake is mutual, or common to all parties to the transaction, and results in a written instrument which does not embody the 'bargained-for' agreement of the parties.

Brannon v. Riffle, 475 S.E.2d 97, 100-01 (W. Va. 1996) (citing Webb v. Webb, 301 S.E.2d 570, 575 n. 5 (W. Va. 1983)). Even if the mistake is characterized as a mistake of fact, the court noted that "[a] party cannot avoid the legal consequences of his actions on

---

[3] In ruling upon the motion for summary judgment, the court rejected Great American's argument that, in event of CPS's default, Honeywell was obligated to perform work under the subcontract without receiving compensation. The court explained that a contract cannot be interpreted in a manner that creates an absurd result. See Dunbar Fraternal Order of Police, Lodge #119 v. City of Dunbar, 624 S.E.2d 586 (W. Va. 2005) (citing Ashland Oil, Inc. v. Donahue, 223 S.E.2d 433 (W. Va. 1976)). The court determined that Great American's interpretation would lead to the absurd result that under the circumstances presented Honeywell would be required to perform control system work for free.

the ground of mistake, even a mistake of fact, where such mistake is the result of negligence on the part of the complaining party." Webb, 301 S.E.2d at 576 (citing Eye v. Nichols, 70 S.E.2d 264 (W. Va. 1952); Taylor v. Godfrey, 59 S.E. 631 (W. Va. 1907); Pennypacker v. Laidley, 11 S.E. 39 (W. Va. 1890); Harner v. Price, 17 W. Va. 523 (1880)); see McGinnis v. Clayton, 312 S.E.2d 765, 770 (W. Va. 1984).

18.    Under the Second Restatement of Contracts, if a party bears the risk of a mistake, the contract is not voidable by reason of the mistake:

> Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.

RESTATEMENT (SECOND) OF CONTRACTS § 152(1) (1979). This section of the Restatement has been adopted by the West Virginia Supreme Court. See Ryan v. Ryan, 640 S.E.2d 64, 68 (W. Va. 2006). Subsection 154(c) of the Second Restatement of Contracts provides that a party bears the risk of a mistake when the court allocates the risk to that party under circumstances in which it is fair to do so: "[a] party bears the risk of a mistake when the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so." RESTATEMENT (SECOND) OF CONTRACTS § 154(c) (1979). Although West Virginia courts have not acknowledged subsection 154(c), the court predicts the West Virginia Supreme Court would adopt it, because of its similarity to and consistency with West Virginia case law. The Supreme Court of West Virginia has recognized many of the provisions of the Second Restatement of Contracts, including several sections in Chapter 6 that relate to mistake. The court concludes the

West Virginia Supreme Court would likewise adopt this section.

19.    The court finds that Honeywell failed to take reasonable steps to ensure the bonds would protect Honeywell in the event CPS defaulted.  Honeywell was well aware of the nature and scope of CPS's responsibilities on the Project; Honeywell's representations regarding CPS and Honeywell's agreement to assume CPS's duties induced Limbach and Rost to award the subcontract to CPS.  Honeywell could have obtained legal advice about whether the bonds would protect Honeywell, or Honeywell could have directed inquiries to Great American about whether the bonds afforded protection.  The court concludes Honeywell's own negligence caused any mistake.  For the same reasons, the court also concludes that, under the circumstances, it is reasonable for Honeywell to bear the risk of the mistake.  The Letter Agreements are therefore not voidable.

20.    While not voidable, the Letter Agreements do need to be reformed, because the Letter Agreements contemplated Honeywell could be paid its costs under the bonds.  Mutual mistake is a ground for reforming a contract.  See Poindexter v. Equitable Life Assur. Soc. of U.S., 34 S.E.2d 340, 343 (W. Va. 1945).  Section 158 of the Second Restatement of Contracts provides: "[i]n any case governed by the rules [concerning mistake], if those rules together with the rules [concerning remedies] will not avoid injustice, the court may grant relief on such terms as justice requires . . . ."  RESTATEMENT (SECOND) OF CONTRACTS § 158(2) (1979).  The court predicts that the Supreme Court of West Virginia would adopt this section of the Restatement; this section has been cited with approval by the supreme court in a concurring opinion in McGinnis v. Clayton, 312 S.E.2d 765, 779 (W. Va. 1984) (Harshbarger, J., concurring).

21.     The court finds that the appropriate relief for the mistake in this situation is not to void

the Letter Agreements, but rather to reform the Letter Agreements.  Honeywell induced

Limbach to award the subcontract to CPS, by representing that CPS was "one of our

foremost Excel 5000 Contractors," Joint Ex. 1, and by assuring Limbach that Honeywell

would assume the duties of CPS under the subcontract in the event of default.  This same

conduct also resulted in Rost agreeing to subcontract the control system work to CPS and

obtain the bonds.  Honeywell's negligence caused the mistake and it is reasonable to

place the risk of the mistake upon Honeywell, as already discussed.  Under the

circumstances, the court concludes that justice requires the reformation the Letter

Agreements.[4]  The court finds justice requires that the Letter Agreements be reformed to

provide that when Honeywell could not look to the bonds for protection, Limbach and

Rost would be responsible for Honeywell's costs in the event Honeywell replaced CPS.

### b. Breach of a Duty Imposed by the Contract

22.     Pursuant to the Letter Agreements, the trigger for Honeywell's duty to assume the

obligations of CPS and complete CPS's work was the default of CPS.  Honeywell alleges

this condition precedent was never met, because CPS was not removed from the Project

site.  For reasons already explained, there was no requirement of removal of CPS in order

for CPS to have defaulted under the Letter Agreements.  The condition precedent was

simply that there had to be "default by [CPS] on the Subcontract as determined by

Limbach."

23.     In this case, CPS defaulted.  Limbach determined that CPS was in default, as Daniels

---

[4] In Part (B)(2), *infra*, the court further analyzes the equities of this case with respect to plaintiff's unjust enrichment claim.  The reasoning underlying the court's decision with respect to unjust enrichment further supports the court's

testified. Both Limbach and Rost notified Honeywell of the determination, and requested Honeywell assume CPS's obligations in accordance with the Letter Agreements. On February 26, 2003, the notices of both Limbach and Rost were faxed to Keller. The parties did not withdraw or retract their notices that CPS was in default.

24.     By the end of March 2003, Amato, a representative of Honeywell, had firsthand knowledge of the underlying deficiencies in CPS's performance that served as the basis for the determination of default by Limbach and Rost. Amato communicated this knowledge to Keller in the March 27, 2003 memorandum.

25.     Since the condition precedent was met, Honeywell had a duty to "assume the obligations of [CPS] under the Subcontract and to complete the work in a timely manner to meet the project schedule requirements." Joint Ex. 10. As already explained, Honeywell was entitled under the Letter Agreements to recover its costs, which include expenses for labor, materials, and overhead. Honeywell, however, negotiated and entered the Remedial Subcontract with Dick in which it would receive compensation, including a profit component, from Dick for control system work. Collection of profit violated the terms of the Letter Agreements.

### c. Damages Resulting From the Breach

26.     As a result of Honeywell's breach, Dick paid Honeywell $388,755.84, which Dick back charged to Limbach; Limbach back charged this amount to Rost. Great American ultimately bore the loss in that amount. Dunn calculated Honeywell's profit for its work on the Project to be $142,733.

27.     Honeywell was not entitled to obtain profit under the Letter Agreements, but did so

decision to reform the contract.

regardless. Great American eventually was responsible for paying for Honeywell's profit. Great American withheld $11,762.18 otherwise owing to Honeywell for an unrelated matter as a set off. The court finds that as a result of Honeywell's breach Great American suffered damages in the amount of $130,970.82 ($142,733 less the amount held for the set off).

28.    West Virginia law provides:

> The jury, in any action founded on contract, may allow interest on the principal due, or any part thereof, and in all cases they shall find the aggregate of principal and interest due at the time of the trial, after allowing all proper credits, payments and sets-off; and judgment shall be entered for such aggregate with interest from the date of the verdict.

W. VA. CODE § 56-6-27; see also CMC Enter., Inc. v. Ken Lowe Mgmt. Co., 525 S.E.2d 295, 299 (W. Va. 1999) ("West Virginia Code § 56-6-27 (1997), however, is the general authority for awarding prejudgment interest in a contract action."). Although this section only references damage awards returned by a jury, the section logically extends to damage awards in non-jury trials. See CMC Enter., 525 S.E.2d at 296 (involving a bench trial in which prejudgment interest was awarded from the date the prevailing party sent an invoice for remodeling work performed but for which it was not paid).[5]

29.    With respect to the applicable interest rate, West Virginia law provides:

> the rate of interest on judgments and decrees for the payment of money, including prejudgment interest, is three percentage points above the Fifth Federal Reserve District secondary discount rate in effect on the second day of January of the year in which the judgment or decree is entered: Provided, *That the rate of prejudgment and post-judgment interest shall not* exceed eleven

---

[5] It should be noted that in addition to prejudgment interest, post-judgment interest is recoverable under West Virginia law. W. VA. CODE § 56-6-31; see Hensley v. W. Va. Dep't of Health and Human Res., 627 S.E.2d 616, 626 n.16 (W. Va. 1998).

> percent per annum or *be less than seven percent per annum*. The administrative office of the Supreme Court of Appeals shall annually determine the interest rate to be paid upon judgments or decrees for the payment of money and shall take appropriate measures to promptly notify the courts and members of the West Virginia State Bar of the rate of interest in effect for the calendar year in question. . . .

W. VA. CODE § 56-6-31 (emphasis added). The applicable interest rate in this case is seven percent. Administrative Order Jan. 5, 2009, Supreme Court of Appeals of West Virginia, http://www.state.ws.us/wvsca/rules/interest2009.pdf ("IT IS THEREFORE ORDERED That the rate of interest for 2009, for judgments and decrees entered on or after January 1, 2009, be and is set at 7.00% . . . .")

30. The court finds that the interest should accrue from August 30, 2004, the date by which Great American demanded Honeywell make payment. The accrued prejudgment interest from August 30, 2004 until the date of this judgment is $43,499.21.[6] Great American's total damages, therefore, are $174,470.03.

## 2. Unjust Enrichment

31. Although the court finds in favor of Great American with respect to its breach of contract claim, the court additionally finds that, in the alternative, Honeywell was unjustly enriched at Great American's expense.

32. Section 1 of the First Restatement of Restitution specifically states:

> § 1. Unjust Enrichment

---

[6] The court calculated the amount of interest by multiplying the amount of principal by the applicable interest rate, and multiplying that product by the number of years. The principal used in the calculation was $130,970.82, the interest rate used was 7.00%, and the number of years used was 4.7447 (from August 30, 2004, to May 29, 2009 (not including the end date)).

A person who has been unjustly enriched at the expense of another
is required to make restitution to the other.

RESTATEMENT (FIRST) OF RESTITUTION §1 (1937). West Virginia courts recognize this principle. See, e.g., Copley v. Mingo County Bd. of Educ., 466 S.E.2d 139, 145 (W. Va. 1995) (recognizing "the equitable doctrine that one will not be allowed to profit or enrich oneself unjustly at the expense of another") (quoting Associated Wrecking and Salvage Co. v. Wiekhorst Bros. Excavating & Equip. Co., 424 N.W.2d 343, 348 (Neb. 1988)); Blue Creek Dev. Co. v. Howell, 133 S.E. 699 (W. Va. 1926) (acknowledging the "equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another").

33.   Under West Virginia law, "if benefits have been received and retained under such circumstance that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the party receiving the benefits to pay their reasonable value." Realmark Devs., Inc. v. Ranson, 542 S.E.2d 880, 884-85 (W. Va. 2000) (quoting Copley, 466 S.E.2d at 145 n.7). The issue in this situation is whether Honeywell's retention of the profits it received under the Remedial Subcontract it entered with Dick is unjust or inequitable.

34.   Allowing Honeywell to keep the profits it received for control system work would be inequitable. The retention of the payments is considered unjust if a party's innocent and material misrepresentation induces the other party to make the payment. See RESTATEMENT (FIRST) OF RESTITUTION § 28(b) (1937) ("A person who has paid money to another because of a mistake of fact and who does not obtain what he expected in return is entitled to restitution from the other if the mistake was induced: by his innocent and

material misrepresentation"); <u>id.</u> § 28 cmt. a ("A transaction can be rescinded for fraud or misrepresentation only if induced thereby, and for innocent misrepresentation only if the representation is material, that is, only if it is as to a fact which would be likely to affect a reasonable man in the transaction in question"); <u>see also</u> <u>Floor Covering Union & Indus.</u> <u>Welfare Trust v. Tompkins</u>, 761 F. Supp. 101, 104 (D. Or. 1991) ("A person who has been unjustly enriched at the expense of another is required to make restitution regardless of whether the reason for the unjust enrichment is an innocent mistake or a material misrepresentation").

35.     The complexity of the relationships between the parties in this case does not alter the general doctrine. Here, Honeywell assured Limbach and Rost, Great American's assignors, that Honeywell would assume CPS's duties in the event CPS was in default and complete the tasks assigned to CPS under the subcontract. This assurance was material, even if it was innocent and made in good-faith, because Honeywell's representations reasonably induced Limbach and Rost to award the subcontract to CPS and induced Rost to obtain the bonds when CPS was unable to obtain bonds. Limbach and Rost would not have awarded the subcontract to CPS without the assurance. CPS was awarded the subcontract and defaulted. Dick would not have entered into a new contract for control system work with Honeywell if CPS had performed or Honeywell had assumed CPS's duties under the subcontract. Honeywell received the monetary benefits of the Remedial Subcontract with Dick due to CPS's default and Honeywell's failure to assume CPS's duties under the subcontract, and CPS was awarded the subcontract due to Honeywell's assurances to Limbach and Rost. Under those

circumstances, causation between the assurance and the monetary benefit to Honeywell is established.

36.    The retention of the full monetary benefit from the Remedial Subcontract is unjust. Honeywell's representation that it would assume CPS's obligations, even if innocent, induced Limbach and Rost to award the subcontract to CPS, and CPS's default along with Honeywell's failure to assume the obligations under the subcontract resulted in Limbach and Rost, Great American's assignors, bearing the responsibility to pay for the monetary benefit. Honeywell was unjustly enriched at Great American's expense. The amount of unjust enrichment is the profit.

37.    Although section 56-6-27 only makes reference to "any action founded on contract," it appears that the amount of damages recoverable for an unjust enrichment claim also includes interest. See CMC Enter., 525 S.E.2d at 296-97, 299 (noting the trial court found a party was unjustly enriched, and the trial court included interest in determining the damages to be awarded against that party); see also RESTATEMENT (FIRST) OF RESTITUTION §156 (1937) ("a person who has a duty to pay the value of a benefit which he has received, is also under a duty to pay interest upon such value from the time he committed a breach of duty in failing to make restitution . . . ."). The court therefore considers the amount of damages suffered by Great American with respect to its unjust enrichment claim is $174,470.03.[7]


### 3. Conclusion

38.    The evidence of record establishes that Honeywell breached the terms set forth in the

Letter Agreements, and, in the alternative, Honeywell was unjustly enriched at Great American's expense. Judgment must be entered in favor of Great American in the amount of $174,470.03. An appropriate order will be entered.

Dated:  May 29, 2009

By the court:

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

cc: Counsel of record

---

[7] See the calculation described in Part (B)(1)(c), *supra*.